No. 13349

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

W.D. (DON) MARTIN, et ux.,

        Plaintiffs and Respondents,

-vs-

GENE RANDONO, et ux. and GREAT FALLS FOREST
PRODUCTS, INC.,

        Defendants and Appellants.

---

Appeal from: District Court of the First Judicial District,
Honorable Peter G. Meloy, Judge presiding.

Counsel of Record:

    For Appellants:

        Stimatz and Engel, Butte, Montana
        Joseph Engel, III argued, Butte, Montana

    For Respondents:

        Knight, Dahood and Mackay, Anaconda, Montana
        Conde F. Mackay argued, Anaconda, Montana

---

Submitted: March 17, 1977

Decided: JAN 10 1978

Filed: JAN 10 1978

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

This is an appeal from a judgment of the District Court, Lewis and Clark County, decreeing that plaintiff W. D. (Don) Martin, et ux. (Martins) were entitled to 22 acres of land by virtue of adverse possession under claim of title.

The land involved is located seven miles east of Lincoln, Montana. It consists of 22 acres of wooded forest land. A saw-mill was loca ted on the property along with several other structures and was operated by the Pappin Construction Co. until 1964. Don Martin was employed by Pappin as the foreman of the sawing crew. Since 1959, Martin also maintained his family residence, a mobile home, partially on the land in dis-pute. In 1964, the Great Falls Forest Products, Inc., ( a Randono family owned corporation) acquired the land and also took over the logging and sawmill operations. The family corpora-tion retained employees from the Pappin Construction Co., in-cluding Don Martin. The Martins' trailer home stayed in the same place.

In the spring 1965 the Great Falls Forest Products, Inc. finishing mill burned down and went out of business; as a result very shortly thereafter, the logging and sawmill operation at Lincoln terminated. It is clear that up to this point Martins acknowledge they were on the land involved with the permission of the Randono family corporation. Don Martin testified that in late 1965 or early 1971 he talked with Gene Randono, the president of the family corporation, and Randono asked him to pay $50 per month rent as a condition to remaining on the property with his trailer home.

This testimony was given at the trial:

"Q.* * * Mr. Martin, after the termination of the operation of the mill by Gray, did anything take place between you and any member of the Defendant corporation relative to your presence on the premises?

"A. Yes. I talked to Gene Randono. He informed me that if I was going to remain on the property I would pay $50 a month rent. I informed him I would not. I considered the ground as mine."

In its findings the trial court relied on this statement exclusively as being a sufficient declaration of intent to adversely possess the property.

On the other hand, W. A. Randono, the vice president of the family corporation (who at the time of the alleged statement was only 17 or 18 years of age) testified that Gene Randono orally permitted Martin to keep his trailer on the land in exchange for Martin's services as a watchman over the property and the structures located on the property. In any event, Gene Randono and his wife Carrol, both defendants in this action, left soon thereafter to live in Nevada and apparently remained there.

After the sawmill was closed Martin acknowedged that for a short time he performed services as a watchman for Gene Randono. Property taxes assessed upon the property by Lewis and Clark County fell delinquent for the years 1964 through 1970. The property was struck off to the county. In January 1971 Don Martin and J. P. Mulcare (not a party to this action) paid $2,670.14 to the Lewis and Clark County Treasurer and received a certificate of assignment for the delinquent taxes. Martin and Mulcare together had been involved in previous property acquisitions. Later, Martin paid Mulcare's one-half of the tax assignment and Mulcare delived a quit claim deed to Martin. During direct examination at trial Don Martin was

- 3 -

asked why he did not pay the taxes each year as they accrued.
He answered:

> "A. I didn't want to alert them [the Randonos]
> to the fact. I figured they should know if the
> taxes were due. They should be paid. If they
> weren't paid, I wanted it left quiet and when
> five years was up I figured I would take it."

After the sawmill closed Don Martin and his son Frank
had a conversation concerning where Don Martin was going to
live. Testifying for his father, Frank replied to a question
on direct examination concerning whether Don Martin ever told
Frank he was attempting to obtain ownership of the property:

> "A. Well, when I asked him where he was going to
> live, he said he was going to stay there and see
> if he couldn't get it for back taxes later on in
> the future sometime."

During the summer 1971, after Don Martin had taken the
tax assignment, a cabin which was approximately 150 feet from
the Martin trailer home, mysteriously burned to the ground.

On May 31, 1972, the family corporation redeemed the tax
assignment by paying $2,956.83 to the Lewis and Clark County
Treasurer. The county treasurer sent a refund to Don Martin but
apparently Martin refused to cash the check, claiming the land
belonged to him. Presumably the county treasurer still holds
the money in trust for Martin. Soon after this redemption the
family corporation tried to sell the land to a Missoula land
speculator, but they were accosted by Martin who claimed the
land belonged to him and ordered them off the land.

The total acreage of the land involved was approximately
22 acres and there was a standing fence on one side only. The
only portion enclosed was around the Martin trailer home. The
Martins did not put the entire 22 acres to their own use by

either cultivating the land or enclosing it. They did however, occasionally pasture a few tethered horses on the land. To facilitate access to their trailer home the Martins built a driveway. They also cleaned up part of the property by removing car bodies and dead trees. Other than this the land remained unimproved. There was significant deterioration to the buildings on the land and to the fence.

It is undisputed that W. A. Randono came frequently to the land during the years involved and especially during the summer and on weekends. Frequently he would bring his brothers and friends with him from the University of Montana. Later his wife also came to the property on many occasions. Frequently they held parties in the cabin and on one occasion in 1969, this irritated the Martins to the extent they called the sheriff and had him come to check out the situation. The deputy testified as to his reason for going to the cabin:

> "A. One night I received a call from Mr. Martin that there were people in a cabin very close to his property who were apparently moving in. They were having parties and a lot of noise and he requested that something be done about it so he could get his sleep at night."

After talking to the occupants of the cabin, the sheriff returned to Don Martin and reported this conversation:

> "A. * * * He [W.A. Randono] said there was no problem that the cabin belonged to his uncle [Gene Randono]. So I have no way of determining proof of ownership of property, so at that point I returned to Mr. Martin and told him what I found out and if anything was to proceed from there, it would probably have to be a civil suit."

During this entire period the Martins admitted the Randonos and their friends used the cabin and stayed there for various periods of time. While the relationship was not

always the best between the Martins and the young Randonos, Martins never directly told the Randonos they owned the land and must get permission to use the land and stay in the cabins. During direct examination Don Martin admitted that he had no objection to Randono and his friends staying at the cabin and that he allowed them to stay there because:

> "A. * * * I figured it easier to not stir them up and cause problems and I didn't want to alert them to the fact that I had my mind up (sic) I was going to accumulate this ground."

During the time period involved Ralph Randono an attorney who was also a listed officer of the family corporation, testified he visited the land involved on several occasions and was never told by the Martins they were claiming the land. He stopped in Lincoln on several occasions to see the Martins and it was always a friendly relationship, they always had coffee brewing. In April 1971, some three months after Don Martin paid the taxes and had taken an assignment, Ralph Randono listed the property with Sorrell Realty Co. of Great Falls. He took the realtor on the land, showed him the boundaries and Don Martin did nothing. Later in 1971, Ralph Randono, Mr. Sorrell and a prospective buyer went on the land and Don Martin did nothing. During this entire period between 1964 and 1971 Ralph Randono knew of no situation that would alarm him that anyone was seeking the property by adverse possession.

In May 1972, W. A. Randono learned Don Martin had taken a tax assignment on the land, and he then redeemed the land by paying all the back taxes, together with interest and penalties. Shortly after the tax redemption, W. A. Randono and a Missoula land speculator went on the land for the purpose of arranging a sale to the speculator. They were then confronted by Don Martin who ordered them off the land, claiming the land was his.

Several months later Don Martin filed a quiet title action claiming adverse possession under claim of title. The Randono family corporation counter sued claiming damages for wrongful withholding of property and damages for the lost sale to the Missoula speculator. The District Court decreed title in Don Martin, and this appeal followed.

In addition to their claim the court was in error in decreeing adverse possession, the Randonos also claim the court should have granted damages for wrongful withholding of property and for the lost sale. The Martins concede they would be liable for damages for wrongful withholding of property were it not for the decree of adverse possession.

We conclude the Martins did not establish adverse possession.

The Martins sought adverse possession under an occupancy that was admittedly permissive, but which they claim they converted into one that was hostile. In Price v. Western Life Insurance Co. (1944), 115 Mont. 509,/514, 146 P.2d 165, this Court recognized that one may convert a permissive possession into a hostile one but "'to make it so there must be a repudiation of the permissive possession * * * and the repudiation must be brought home to the owner by actual notice * * *.'" In Price, we stated the burden to overcome permissive use, quoting with approval from Lindokken v. Paulson, (1937), 224 Wis. 470, 272 N.W. 453,455, to be:

> "'The law is very rigid with respect to the fact that a permissive use in the beginning can be changed into one which is hostile and adverse only by the most unequivocal conduct on the part of the user. The rule is that the evidence of adverse possession must be positive, must be strictly construed against the person claiming a prescriptive right, and that every reasonable intendment should be made in favor of the true owner.'"

Whether one is seeking to convert permissive possession into a prescriptive right or into one of outright ownership,

we see no difference in the burden the claimant must bear. Using this rule as a yardstick the Martins have failed in their burden.

The District Court in addition to concluding that the Martins had fulfilled the requirements of possession for 5 years and payment of taxes, section 93-2513, R.C.M. 1947, held:

> "* * * that their possession has been actual, visible, exclusive, hostile and continuous for the full period necessary to create a bar under the statute of limitations."

These requirements of section 93-2513 must be proven to establish a claim of adverse possession. Smith v. Duff, (1909), 39 Mont. 374, 102 P. 981; Ferguson v. Standley, (1931), 89 Mont. 489, 300 P. 245; Townsend v. Koukol, (1966), 148 Mont. 1, 416 P.2d 532.

To convert the original permissive possession into one of a hostile claim the trial court relied exclusively on the statement made by Martin when he claimed he refused to pay rent to Gene Randono and considered the land as his own. Even assuming this statement to be true, it is at best equivocal, and certainly cannot be construed to be a statement of intent to possess and own the entire 22 acres. The statement was: "I informed him I would not [pay rent]. I considered the ground as mine." If rent was requested from Martin it could have been for the rent of the piece of land on which the trailer home was located. It is not clear from this testimony that Martin actually made a statement to Gene Randono that he was claiming ownership of the land.

Further, the conduct and statements of the Martins from 1965 through 1971, failed to establish the requisite elements of adverse possession. It appears the Martins were relying more on their misconceived application of the law. To them possession, plus ultimately paying the back taxes for five years, was sufficient to establish their claim to adverse possession. That is not enough.

- 8 -

While it might be argued their possession was actual and visible, and perhaps even continuous, it was not exclusive and hostile. Don Martin's testimony demonstrates he did not object to the Randonos coming onto the land, living in the cabins, and generally coming and going as they pleased. His reason for not objecting belies any intent to take the property by true adverse possession. He testified he did not object because he did not want to put the Randonos on notice of his intent to later "accumulate this ground." He further testified he did not pay the back taxes year by year as they accumulated because he did not want to put the Randonos on notice of his intent to acquire the land in the future. By these admissions the Martins clearly failed to establish that their possession was exclusive and hostile.

From the inception of the first claim of right to the land through the entire period required for adverse possession, it was required that the Martins' conduct be continuously hostile and exclusive to the true owners. Here, the possession was purposely nonhostile and nonexclusive. It is axiomatic that adverse possession does not allow the possessors to mask their conduct and acquire the land by hiding their true intentions from the owners of record.

Adverse possession under claim of title is limited specifically by sections 93-2510 and 93-2511, R.C.M. 1947. The trial court in making its findings and conclusions did not determine if these statutes had been fulfilled. Section 93-2510 provides that if the claim is not under a written instrument, judgment, or decree

"* * * the land so actually occupied, and no other, is deemed to have been held adversely."

The companion statute, section 93-2511, further limits adverse possession by providing that where the claim is not under a

- 9 -

written instrument, judgment, or decree land is deemed to have been possessed and occupied in the following cases only:

"1. Where it has been protected by a substantial inclosure;

"2. Where it has been usually cultivated or improved."

Here, it appears the land at one time was surrounded by a fence on all sides. However, during the period of the alleged adverse possession, the fence and other structures on the property deteriorated significantly. At the end of the alleged prescriptive period a fence existed only on one side of the property. One of the cabins was destroyed by fire and the other structures were damaged by vandals, and thieves carried off much of the personal property within the buildings. The land was never cultivated and the alleged improvements consisted of moving six or more car bodies (it was never established who owned the car bodies); cutting and removing of dead trees near the trailer home; building a driveway for easier access to the trailer home; and, in general, cleaning up the place. Suffice it to say, this evidence did not fulfill the requirements of the statutes.

The Martins concede liability for wrongful withholding of the premises, if their claim of adverse possession is not upheld. However, they maintain that in such event the claim of damages for lost profits was not proven. Because the trial court upheld the claim of adverse possession, it did not make findings or conclusions on either of the counterclaims. Accordingly, the amount of damages for wrongful withholding must still be determined by the trial court and it must also enter findings and conclusions on the Randonos' counterclaim of damages because of a lost sale.

- - 10 -

We reverse the judgment of the District Court and remand this cause for further proceedings consistent with this Opinion.

_Daniel J. Shea_
Justice

We Concur:

_Jane P. Hartuto_
Chief Justice

_Gene B. Daly_

_Frank I. Haswell_

_John Conway Harrison_
Justices.

- 11 -