DA 12-0191

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 16

DAVID W. HARRIS,

       Plaintiff and Appellant,

   v.

STATE OF MONTANA, DEPARTMENT
OF CORRECTIONS and FICTITIOUS
DEFENDANTS 1 through 10,

       Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Second Judicial District, In and For the County of Silver Bow, Cause No. DV 09-315 Honorable Brad Newman, Presiding Judge |

COUNSEL OF RECORD:

       For Appellant:

              Robert G. McCarthy, McCarthy Law, P.C., Butte, Montana

       For Appellees:

              James P. Harrington, Attorney at Law, Butte, Montana

                       Submitted on Briefs:  September 4, 2012
                               Decided:  January 29, 2013

Filed:

_____
                               Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     Plaintiff appeals from the judgment of the District Court for the Second Judicial District, Silver Bow County, granting summary judgment to Appellees.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     David Harris (Harris) has been employed by the Department of Corrections (DOC) for approximately 13 years, specifically as a correctional officer at the Montana State Prison (MSP) in Deer Lodge, Montana.  Since November 16, 2000, he has served as a member of the Special Response Team (SRT) at MSP, which he continues to do today.  SRT is an elite special weapons and tactical response team (SWAT) whose members are extensively trained to respond to the prison's most dangerous crises such as inmate riots, escapes, and hostage situations.  Membership is voluntary.  To become a member, an applicant must qualify in physical fitness and firearms proficiency, and successfully undergo an interview process.  If selected to join the team, the member must agree to fulfill the rigorous training requirements, which include attending a specialized six-day, 70-hour Primary SWAT Training and monthly 8-hour training sessions at the prison.  Any SRT member who does not wish to fulfill the training requirements may resign from the team at any time.  As of July 1, 2005, members of the SRT received an extra 50 cents per hour for being a team member.

¶3     In 2006, Mike Mahoney (Mahoney), the Warden at MSP, decided that the prison would purchase and use X-26 tasers, manufactured by Taser International.  A taser is an electric stunning device which temporarily incapacitates superficial muscles.  In accordance with the manufacturer's recommendations, Mahoney issued a policy

2

requiring all individuals who wanted to be authorized to use a taser at the prison to complete taser training, which included undergoing a five-second taser exposure. The direct experience of the voluntary exposure was meant to instill in the trainee an understanding of the effects of the taser and encourage the trainee to use the taser in a safe manner. According to Mahoney, none of the training was intended "to harm or injure any of the trainees in any way," and extensive safety precaustions were used during the training to avoid injury. No employees were required to use tasers at MSP, and none were subject to job loss if he or she refused to undergo the tasing training. However, the training was mandatory for all members of the voluntary SRT team.

¶4 On June 28, 2006, all of the MSP wardens, which included Mahoney, the deputy warden, and the associate wardens, underwent taser training and the five-second exposure at the DOC. The lead instructor of the training was Sergeant Kim Micu (Micu), who at the time was an employee of MSP and certified by Taser International. There is no allegation or evidence that any of the wardens received any injuries as a result of their five-second exposures.

¶5 Then, on July 26, 2006, a taser training was held for the SRT at the DOC Center. Micu was the lead instructor. The training was conducted according to the Taser International training standards, and consisted of a classroom component and a five-second exposure. The classroom component of the training involved a 173-page Power Point presentation based on the training materials provided by Taser International. All of the materials from the Power Point presentation, which included slides specifically addressing the risks of taser exposure, were distributed as handouts to each trainee,

including Harris. The risks of undergoing taser exposure were also disclosed in a written consent form that Harris signed prior to his five-second exposure. These risks included "severe" muscle contractions that "may result in injuries to muscles, tendons, ligaments, backs, joints and stress fractures." Additionally, the form advised that the nature of tasing "involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities." At no time did Harris or any other SRT member object to completing the training or undergoing the voluntary exposure.

¶6 Art Garrison (Garrison), a corrections officer at MSP and lieutenant in command of the SRT, in July 2006, was the first person to undergo the voluntary exposure at the July 26, 2006, training. He suffered no injury from the tasing, and afterwards he served as a spotter to the other trainees. Following Garrison's tasing, the SRT members underwent the exposure, including Harris. As a result of his five-second taser exposure, Harris claimed to have sustained injuries to his thoracic and lumbar spine. He received workers' compensation benefits.

¶7 On July 23, 2009, Harris filed a complaint against the State of Montana, the DOC and several fictitious defendants (collectively "Appellees"). He alleged that he suffered an intentional infliction of personal injury by his fellow employee when he was tased by Micu at the July 26, 2006, training. He further raised a spoliation of evidence claim for the alleged loss or destruction of the DOC's video recording of the taser training session. Appellees moved for summary judgment, arguing the suit was barred by the exclusive remedy provision of the Workers' Compensation Act (WCA) and that there was no

independent cause of action for Harris's spoliation of evidence claim. On March 6, 2012, the District Court granted Appellees' motion for summary judgment, and dismissed Harris's claims with prejudice.

¶8 Harris timely appealed. We restate the issues on appeal as follows:

¶9 *Issue One: Did the District Court err in granting summary judgment for Appellees on the grounds that Harris's suit is barred by the exclusive remedy provision of the Workers' Compensation Act?*

¶10 *Issue Two: Did the District Court err in determining that Harris does not have a cause of action for spoliation of evidence?*

## STANDARD OF REVIEW

¶11 We review the grant of summary judgment de novo, using the same M. R. Civ. P. 56 criteria used by the district court. *Albert v. City of Billings*, 2012 MT 159, ¶ 15, 365 Mont. 454, 282 P.3d 704. Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law. *Albert*, ¶ 15. Once the moving party has met its burden, the non-moving party must present substantial evidence essential to one or more elements of the case to raise a genuine issue of material fact. *Styren Farms, Inc. v. Roos*, 2011 MT 299, ¶ 10, 363 Mont. 41, 265 P.3d 1230. Conclusory statements are insufficient to raise a genuine issue of material fact. *Styren Farms, Inc.*, ¶ 10. We further review a question of law to determine if the district court's legal conclusions are correct. *Palmer v. Bahm*, 2006 MT 29, ¶ 11, 331 Mont. 105, 128 P.3d 1031.

## DISCUSSION

¶12 *Issue One: Did the District Court err in granting summary judgment for Appellees on the grounds that Harris's suit is barred by the exclusive remedy provision of the Workers' Compensation Act?*

¶13 Harris argues on appeal that the District Court incorrectly concluded that his suit was barred by § 39-71-411, MCA, and thus erred in granting summary judgment against him. He contends that because Appellees intentionally and deliberately caused him to be tased, knowing it would injure him, his claim involves an "intentional injury" and therefore falls into the exception to the exclusive remedy provision of the WCA.

¶14 Appellees counter that their actions did not create an intentional injury as defined by § 39-71-413, MCA, and Harris's claims are thus subject to the exclusive remedy provision. The purpose of the training and voluntary exposure, they contend, was to educate and train the employees to safely use a taser and to experience exposure in a controlled environment; it was not to injure anyone. Further, while they admit that they knew that the use of a taser entails a risk of harm, as clearly detailed in the Power Point presentation and in the consent form that Harris signed, they did not know for certain that Harris would be injured. Since Harris did not submit any evidence that suggested Appellees intended to harm him, nor did he present any information showing Appellees had actual knowledge that using a taser on him would cause him injury, Appellees argue the District Court correctly determined there were no issues of material fact and that summary judgment in favor of Appellees was appropriate.

6

¶15 The WCA generally provides the exclusive remedy for an employee who suffers an injury in the scope of his or her employment. Section 39-71-411, MCA. However, there is a narrow exception to this provision if an employee is "intentionally injured" by the employee's employer or fellow employee while performing the duties of employment. Section 39-71-413(1), MCA; *Wise v. CNH Am., LLC*, 2006 MT 194, ¶ 7, 333 Mont. 181, 142 P.3d 774. The statute defines intentional injury as an injury caused by an "intentional and deliberate act that is specifically and actually intended to cause injury to the employee injured and there is actual knowledge that an injury is certain to occur." Section 39-71-413(3), MCA; *see Wise*, ¶ 7. In other words, for a suit to fall into the exception to the exclusivity provision of the WCA, plaintiffs must allege facts or submit evidence sufficient to satisfy two required elements: (1) an intentional and deliberate act specifically and actually intended to cause injury; and (2) actual knowledge of the injury's certainty. *Alexander v. Bozeman Motors, Inc.*, 2010 MT 135, ¶ 21, 356 Mont. 439, 234 P.3d 880; *see also Wise*, ¶ 11.

¶16 Harris maintains that the actions of Appellees in exposing Harris to the taser "were intentional and deliberate" and thus fall within the WCA exception. He asserts that although Appellees did not actually intend that he receive the injuries he did, this "has no bearing on the fact that [Appellees] intentionally caused him to be subjected to the [taser]," knowing there was the possibility of serious injury. The District Court was correct when it stated that Harris's argument "missed the legal mark," because a chance of injury is not the same as an employer's deliberate act to injure an employee.

¶17    We recently took the opportunity in *Alexander v. Bozeman Motors, Inc.*, to discuss the evolution of the law relative to establishing intent for purposes of recognizing when plaintiffs are limited to the exclusive remedy of the WCA, and when their claim falls within its exception.  While we do not think it is necessary to recite the entire history of § 39-71-413, MCA, again today, we will highlight what is most instructive to our analysis in the case before us.

¶18    In 2001, the Legislature amended § 39-71-413, MCA, to its present form.  2001 Mont. Laws 1095-96.  Prior to the amendments, the statute provided that an injured employee's remedy was not restricted to workers' compensation benefits if the employee's injury was caused by the "intentional and malicious act or omission" of the employer or fellow employee.  2001 Mont. Laws 1096.  The purpose of the amendments was to remove the "malice" component and allow an injured employee to recover from an employee or employer who caused an "intentional injury," and to narrowly define the meaning of such an "intentional injury."  2001 Mont. Laws 1095-96.

¶19    In his brief, Harris cites to several cases that were decided before the 2001 amendments.[1]   Our analyses in these cases regarding what constitutes "intentional" conduct in the context of the WCA's exclusivity provision remain useful to the extent they considered the proof required to show harm an employer specifically directed at an employee.  None, however, provides support for Harris's arguments.  In only one of these cases did we determine that the plaintiff presented sufficient allegations to support his

---

[1] Specifically, he cites to *Blythe v. Radiometer Am., Inc.*, 262 Mont. 464, 866 P.2d 218 (1993); *Calcaterra v. Mont. Resources*, 1998 MT 187, 289 Mont. 424, 962 P.2d 590; *Lockwood v. W.R. Grace & Co.*, 272 Mont. 202, 900 P.2d 314 (1995).

contention that there was an intentional injury allowing exception to the exclusive remedy of the WCA; however, it is distinguishable from the present case on both the facts and the law. In *Lockwood v. W.R. Grace & Co.*, 272 Mont. 202, 900 P.2d 314 (1995), the plaintiff alleged his employer, W.R. Grace, intentionally harmed him by allowing him to work in a vermiculite mine and mill for several years when it knew or had reason to know that extended inhalation of vermiculite and asbestos particles created a high degree of harm. *Lockwood*, 272 Mont. at 208, 900 P.2d at 318. Lockwood worked in the mill for approximately ten years. *Lockwood*, 272 Mont. at 204, 900 P.2d at 316. Six years after he retired, he was diagnosed with mesothelioma, an asbestos-specific cancer, and died shortly thereafter. *Lockwood*, 272 Mont. at 204, 900 P.2d at 316. His widow filed a complaint against W.R. Grace; however, the district court dismissed it on the grounds that benefits under the Occupational Disease Act of Montana (MODA) were her exclusive remedy pursuant to § 39-72-305, MCA[2]. *Lockwood*, 272 Mont. at 204, 900 P.2d at 316.

¶20 On appeal, we determined that Lockwood's allegations included an intentional harm sufficient to avoid MODA's exclusivity. *Lockwood*, 272 Mont. at 211, 900 P.2d at 319. Specifically, his allegations include that: Grace knew its acts created a high degree of harm to Lockwood; Grace actively concealed this knowledge from Lockwood; Grace failed to provide protective equipment sufficient to avoid the danger; Grace advised

---

[2] MODA generally provided for compensation by an employer to an employee disabled by reason of occupational disease arising out of the course of employment. It applied to all employers and employees subject to Montana's WCA. In 2005, the Montana Legislature merged MODA into the WCA. For purposes of analyzing intent, the analysis under MODA in *Lockwood* with respect to its exclusive remedy provision is instructive to our analysis under the exclusive remedy provision of the WCA.

Lockwood that exposure to vermiculite and asbestos was safe; and these actions proximately caused Lockwood's death. *Lockwood*, 272 Mont. at 208, 900 P.2d at 318. Harris relies on *Lockwood* for the proposition that an "intent to injure does not mean desire to injure;" even if an employer did not desire for an employee to be injured, he or she could still have "intended that the employee [ ] undergo the injury . . . ." *Lockwood*, 272 Mont. at 210, 900 P.2d at 319. Harris argues that the fact Appellees did not desire that he be injured, just as W.R. Grace did not desire for Lockwood to receive his injuries, does not mean the intent element was not satisfied.

¶21    *Lockwood* was decided under a different version of the "intentional harm" exception to exclusivity, but retains some relevancy for its focus on the employer's actual knowledge that the employee was being harmed as opposed to a "mere allegation of known risk." *Lockwood*, 272 Mont. at 210, 900 P.2d at 319. Harris nevertheless fails to establish that the intent to injure was present in his case. Appellees submitted affidavits to the District Court in which they maintained that the intent in using a taser during the training was to train individuals in the safe and effective use of the taser at MSP, not to injure anyone. Harris submitted one personal affidavit in which he explained his understanding of the purpose and effects of the taser, and his awareness of the risks associated with the five-second exposure, but did not present any affidavits or discovery materials placing Appellees' intent at issue.

¶22    Unlike in *Lockwood*, where Grace allegedly concealed knowledge from the plaintiff that the work environment was dangerous, lied to him that it was safe, and failed to provide any protection against the known harm, here Appellees made the potential

10

risks of the tasing very clear to Harris, and provided mats and spotters to protect him. Additionally, Harris's supervisors, including Mahoney, underwent the five-second exposure before Harris or any of the other SRT members. Harris therefore was not asked to do anything his supervisors were not willing to do themselves. Mahoney's policy was not meant to injure the trainees, who included himself and the other wardens, but rather to ensure that all employees at MSP who wanted to use a taser learn how to do so in a safe manner. Harris underwent the tasing at his own free will, giving full written consent to the exposure while acknowledging its potential risks. There is nothing to suggest Appellees deliberately acted with the intent to harm him.

¶23 Harris correctly points out that an employer's intent may be inferred from facts and circumstances, and direct proof that the employer intended to cause an intentional injury is not required in order to survive a motion for summary judgment. *See Alexander*, ¶ 26. However, as we just illustrated, Harris failed to provide any evidence from which we can infer that the intent was to harm rather than educate and train. Instead, he points to the training materials that disclosed the risks associated with tasing, and merely speculates that Appellees intended to injure Harris "to some extent" by using the taser on him. We have previously said that the party opposing summary judgment " 'must set forth specific facts and cannot rely on speculative, fanciful, or conclusory statements.' " *Sprunk v. First Bank Sys.*, 252 Mont. 463, 466, 830 P.2d 103, 105 (quoting *Simmons v. Jenkins,* 230 Mont. 429, 432, 750 P.2d 1067, 1069 (1988)). Viewing the facts in the light most favorable to Harris we conclude that he did not meet his burden and that the District

11

Court correctly determined that Harris failed to present any evidence that Appellees deliberately intended to harm him.

¶24 We also agree with the District Court that Harris failed to identify any evidence that Appellees had actual knowledge that Harris's exposure to the taser was certain to injure him, the second requirement of § 39-71-413(3), MCA. On appeal, Harris argues that Appellees knew that shooting Harris would "cause . . . pain which can be stressful." He points to the materials that were presented at the training session to argue that because Appellees knew of the potential effects of being shot with a taser, they knew that he was going to "receive at least some injury and knew the possibility of serious injury or even death existed." Harris additionally argues that Appellees took the precautions of placing the trainees on padded mats and providing them with spotters for physical support because they knew he would be injured.

¶25 A risk or possibility of injury does not establish actual knowledge of the injury's certainty as required by the statute. In *Alexander*, two former employees of Bozeman Motors, Ostermiller and Alexander, filed suit against the company on the grounds that it intentionally injured them when a gas stove leaked propane into their office, causing a build-up of carbon monoxide. *Alexander*, ¶¶ 2-7. Ostermiller worked in the office first, and stated that after he noticed the smell of propane at work, and upon feeling ill as a result of the inhalation of the chemical, he complained to Bozeman Motors. Bozeman Motors allegedly did nothing. *Alexander*, ¶ 3. Not long after, Ostermiller lost consciousness while in the office. *Alexander*, ¶ 3. He did not return to work thereafter. *Alexander*, ¶ 3. Alexander began working in the office soon after Ostermiller left, and

12

also complained to Bozeman Motors about the harmful physical symptoms he was experiencing at work. *Alexander*, ¶ 4. Bozeman Motors did nothing, and Alexander's health allegedly deteriorated to the point where he could no longer come to work. *Alexander*, ¶¶ 4-5. The district court granted summary judgment against Ostermiller and Alexander, determining they failed to show that Bozeman Motors intentionally injured them, and their claims were thus subject to the exclusivity provision of the WCA. *Alexander*, ¶ 10.

¶26 On appeal, we affirmed the entry of summary judgment against Ostermiller, and reversed with respect to Alexander. *Alexander*, ¶ 37. We concluded that Ostermiller's allegations that Bozeman Motors intentionally and deliberately exposed him to dangerous conditions in his office (contaminated air), and did not respond to his complaints that he was becoming ill, nor take any measures to address the conditions, "viewed in a light most favorable to the Employees, simply do[es] not establish that Bozeman Motors had actual knowledge that requiring Ostermiller to work in this office would result in certain injury." *Alexander*, ¶ 22. With regard to Alexander, however, the facts led us to a different conclusion. Alexander alleged that since Bozeman Motors knew of Ostermiller's injury it had actual knowledge of the harm posed by the use of the stove in the office when it sent Alexander to work there. *Alexander*, ¶ 31. Further, Alexander asserted that he complained to Bozeman Motors, and that Bozeman Motors failed to warn him about the dangers posed by the stove. *Alexander*, ¶ 31. We determined that these allegations were sufficient to raise a genuine issue of material fact on whether Bozeman

13

Motors "intentionally injured" Alexander as defined by § 39-71-413, MCA, and summary judgment was thus inappropriate. *Alexander*, ¶¶ 31-32.

¶27 In the case at hand, like Bozeman Motors who had no actual knowledge that injury was certain to occur to Ostermiller, Appellees had no such knowledge that tasing Harris would result in certain injury. There is no evidence of any prior reports of injury during taser training, nor of any other actions on Appellees' behalf to suggest they knew with certainty that Harris's voluntary exposure would harm him. Harris's supervisors underwent the exposure prior to Harris, and no one received any injuries as a result. Further, unlike in *Alexander* where Bozeman Motors allegedly failed to warn Alexander of known dangers, Appellees were nothing but candid about the known risks of the taser.

¶28 Harris cites to *Lockwood* to support his position that Appellees knew that the taser would cause him injury. He argues that like Lockwood, who was put in a situation where his employer "knew that a high risk existed that he would be injured," Appellees knew that tasing Harris would cause some injury and had the potential to cause serious injury or death. Harris's reliance on *Lockwood* is misplaced. In *Lockwood*, we stated that "an allegation of less than actual knowledge . . . is insufficient as a matter of law to serve as the basis for avoiding MODA exclusivity." *Lockwood*, 272 Mont. at 209, 900 P.2d at 318. We recognized the difference between situations in which a defendant knew that its acts created a high degree of *risk* to the plaintiff versus a high degree of *harm*. The former, we determined, does not constitute an intentional injury. *Lockwood*, 272 Mont. at 209, 900 P.2d at 318. The latter, we said, "differs significantly from a mere allegation of known risk." *Lockwood*, 272 Mont. at 210, 900 P.2d at 319.

14

¶29  In *Lockwood*, we found sufficient support for Lockwood's allegations that Grace knew its acts created a high degree of harm to Lockwood, particularly because Grace allegedly concealed its knowledge of the harm and affirmatively advised Lockwood that exposure to the vermiculite and asbestos dust was safe. *Lockwood*, 272 Mont. at 210, 900 P.2d at 319. The distinction between cases in which the knowledge element is met and when it is not is "the employer's alleged knowledge that the employee is being injured, in the former, versus the employer's exposing the employee to risk of harm without certain knowledge that the employee is being or will be harmed, in the latter." *Lockwood*, 272 Mont. at 210, 900 P.2d at 319.

¶30  Here, Appellees knew that using a taser created a risk of harm to Harris and the other employees who chose to undergo the exposure, which it fully disclosed during the training. However, there is nothing to indicate that they had certain knowledge that any of the employees would be harmed. Because an employer's knowledge that its acts pose a risk to a plaintiff is not sufficient to establish "actual knowledge" of an injury's certainty, as required by § 37-71-413, MCA, Harris failed to satisfy this requirement.

¶31  For the foregoing reasons, we conclude that the District Court did not err when it determined that the WCA was the exclusive remedy for Harris's injuries and that his claims did not fall within the exception set forth in § 39-71-413, MCA.

¶32  *Issue Two: Did the District Court err in determining that Harris does not have a cause of action for spoliation of evidence?*

¶33  Harris argues the DOC either intentionally or negligently lost or destroyed the videotape of the July 26, 2006, training, and that he therefore has a valid cause of action

15

against Appellees for intentional or negligent spoliation of evidence.

¶34 The torts of intentional and negligent spoliation of evidence are not recognized in Montana as independent causes of action against a direct party. *See Oliver v. Stimson Lumber Co.*, 1999 MT 328, ¶ 32, 297 Mont. 336, 993 P.2d 11. They apply only to non-parties to the litigation. *Estate of Willson v. Addison*, 2011 MT 179, ¶ 23, 361 Mont. 269, 258 P.3d 410. Under the Montana Rules of Civil Procedure, trial judges are well-equipped to address a situation where one party alleges spoliation of evidence by another party in a lawsuit, and can even enter default when necessary. *Oliver*, ¶ 32. Here, Harris brought the claim against a direct party in the case; no third party was alleged to have destroyed evidence. Therefore, his tort claim is not recognized in Montana. In order for the District Court to have had authority to address Harris's spoliation of evidence argument in some other way, there would have to first be a viable cause of action. *See Oliver*, ¶ 32. Because Harris's personal injury claim against Appellees is barred by § 39-71-411, MCA, the District Court correctly determined that it could not remedy his alleged spoliation of evidence assertions.

## CONCLUSION

¶35 For the reasons stated above, we affirm the District Court's Order granting Appellees' motion for summary judgment.

¶36 Affirmed.

/S/ Michael E Wheat

16

We Concur:

/S/ Mike McGrath
/S/ Beth Baker
/S/ Patricia O. Cotter


Justice Jim Rice, concurring.

¶37   I concur with the result reached by the Court but not with the analysis. I believe the Court's decision will foster confusion regarding the intentional injury exception to worker's compensation exclusivity.

¶38   Harris cites to several cases that were decided under prior statutory schemes governing the intentional injury exception. The Court states that the analyses regarding intentional injury in these prior-law cases "remain useful" regarding "the proof required to show harm an employer specifically directed at an employee." Opinion, ¶ 19. About one of these, the 1995 *Lockwood* case, the Court states the holding there concerning the intention necessary to establish that an injury was intentional "retains some relevancy." Opinion, ¶¶ 20-21. The Court's overall holding is premised in large part upon its discussion and application of *Lockwood*. *See* Opinion, ¶¶ 19, 20, 22, 28, 29. The Court concludes by reaffirming the *Lockwood* construct that "[t]he distinction between cases in which the knowledge element is met and when it is not is 'the employer's alleged knowledge that the employee is being injured, in the former, versus the employer's exposing the employee to risk of harm without certain knowledge that the employee is being or will be harmed, in the latter.'" Opinion, ¶ 29 (quoting *Lockwood*). After

17

reaffirming the analysis in *Lockwood*, the Court distinguishes it from the present case on the ground that the employer in *Lockwood* "allegedly concealed knowledge from the plaintiff that the work environment was dangerous." Opinion, ¶ 22. I submit that the Court's analysis is not a precise statement of current law and will engender confusion.

¶39 The legislative amendments to § 39-71-413, MCA, were significant, as they were expressly intended to overturn prior court applications of the statute. *See* Ch. 229, Laws of Montana (2001) (stating the bill was introduced to redefine the standard of intentional injury in response to court decisions); *see also Wise v. CNH America*, 2006 MT 194, ¶ 11, 333 Mont. 181, 142 P.3d 774 ("The amended version of § 39-71-413, MCA, contains significantly different language than the version we interpreted in *Sherner*."). The "intentional injury" necessary to come within the exception to exclusivity is now defined as "an injury caused by *an intentional and deliberate act* that is specifically and actually *intended* to cause injury to the employee injured and there is *actual knowledge* that an injury is *certain to occur*." Section 39-71-413(3), MCA (emphasis added); *see also Alexander*, ¶ 21. This is not the same definition as provided in the *Lockwood* construct of intentional injury here employed by the Court. *See* Opinion, ¶ 29. The *Lockwood* construct determined that "the knowledge element is met" by "the employer's alleged knowledge that the employee is being injured." Opinion, ¶ 29 (citing *Lockwood*). The *Lockwood* construct does not incorporate the concept, now in current law, that the necessary intention for the injury is multi-layered: caused by an "intentional and deliberate act" that was "specifically and actually intended to cause injury," plus "actual

18

knowledge that an injury is certain to occur." In *Alexander*, we cited *Lockwood* as background but enunciated a new standard based upon the new statute:

> [W]e hold that deliberate and intentional conduct may be inferred from factual allegations indicating that an employer knew an employee was being harmed, failed to warn the employee of the harm, and intentionally continued to expose the employee to the harm. Additionally, as required under the plain language of § 39-71-413(3), MCA, the employee must allege and demonstrate that the employer had "actual knowledge" of the certainty of injury.

*Alexander*, ¶ 30. Whatever relevancy *Lockwood* and other prior-law cases have was subsumed into this statement about the new standard. It strikes me as unwise to premise an opinion primarily on the *Lockwood* construct when, at best, it addresses the new intention element only in part.

¶40 Instead of reaffirming prior-law cases and holding that this case turns on the absence of "concealed knowledge . . . that the work environment was dangerous" that distinguishes this case from *Lockwood*, Opinion, ¶ 22, I would simply affirm the District Court by concluding that the evidence offered by Harris did not satisfy the definition of "intentional injury" as currently defined by statute and as applied in *Alexander*.

¶41 I concur.


/S/ Jim Rice


19