FILED

October 16 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 13-0026

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 306

GAYLE P. PEDERSEN,
as Trustee of the Gayle P. Pedersen Trust,

      Plaintiff and Appellee,

   v.

DEAN ZIEHL and NANCY ZIEHL,
individually and as Trustees of Ziehl
Family Trust dated January 16, 2004,

      Defendants and Appellants.


APPEAL FROM:    District Court of the Eleventh Judicial District,
                    In and For the County of Flathead, Cause No. DV 09-312A
                    Honorable Heidi Ulbricht, Presiding Judge


COUNSEL OF RECORD:

        For Appellants:

                Donald V. Snavely; Snavely Law Firm; Missoula, Montana

                Evonne Smith Wells, Tal M. Goldin; Wells & McKittrick, P.C.;
                Missoula, Montana

        For Appellee:

                Randall A. Snyder; Snyder Law offices; Bigfork, Montana


                                  Submitted on Briefs:  August 21, 2013
                                        Decided:  October 16, 2013


Filed:

_____
                          Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Dean and Nancy Ziehl (the Ziehls) appeal from the Judgment of the Montana Eleventh Judicial District Court determining that they do not own a prescriptive easement over a portion of dock that extends onto Gayle Pedersen's (Pedersen) property. The District Court ordered that the intruding portion of dock be removed and costs be awarded to Pedersen. We affirm and address the following issue, restated by this Court:

¶2 *Did the District Court err by holding that the Ziehls failed to adversely use the dock for the required statutory period in order to obtain a prescriptive easement?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 This case involves a big dispute over a small piece of dock located on the Swan River in Bigfork. To explain the dispositive facts about the conflict, it is necessary to trace the ownership history of the properties involved. Prior to 2000, Fred and Judy Bysshe (the Bysshes) owned the north half of Lot 4 and Lots 5, 6, and 7 of Block 1 of Bigfork Original. Lots 4, 5, and 6 directly bordered the Swan River, and Lots 5 and 6 each had their own dock. At that time, Lot 7 did not touch the river and had no dock.

¶4 In July of 2000, the Bysshes decided to sell Lot 7 to Paul Nicodemus (Nicodemus). The property was initially advertised as having river-front access even though it did not. In an effort to accommodate the advertised listing, the Bysshes commissioned a boundary adjustment survey to redraw the property lines. The survey shifted the boundary between Lots 6 and 7 in order to give Lot 7 access to the river. In so doing, the survey divided the dock that had previously fronted only Lot 6. After the

2

survey, most of the dock was located on Lot 7, but the Bysshes had purposefully retained a portion of the dock's southwestern corner for Lot 6. The survey also renamed Lot 6 and Lot 7 as "Lot 6A" and "Lot 7A," respectively. Nicodemus closed his purchase of Lot 7A and recorded the deed on September 8, 2000.

¶5 From the time of the survey until 2002, the Bysshes continued to own Lot 6A. Judy Bysshe discussed the dock situation with Nicodemus and her realtor. The District Court found that Judy Bysshe clearly told Nicodemus that the southwestern portion of the dock belonged to Lot 6A, but was to be shared and used permissively as a neighborly accommodation. And although the dock's condition had deteriorated over the years, Nicodemus would occasionally use it and park his boat there.

¶6 Pedersen began considering purchasing Lot 6A from the Bysshes in 2001. Although she visited the property a number of times, Pedersen failed to observe anyone using the dock. On October 15, 2002, Pedersen closed on Lot 6A, and immediately began cleaning and clearing brush from the property. In 2003, Pedersen re-landscaped the riverfront area, and in 2004, she constructed a residence and business on the property. During this time, Pedersen did not use the dock, nor did she see Nicodemus using it.

¶7 In August of 2004, the Ziehls purchased Lot 7A from Nicodemus. The Ziehls began using the dock in June of 2005 and then hired a contractor, Dan Day (Day), to renovate it in 2006. Before beginning work, Day applied for a permit, which incorrectly identified the Ziehls as the exclusive owners of the existing dock. At some point during construction, Pedersen informed Day that he was trespassing on her property and

3

demanded that he cease working. Day told the Ziehls about Pedersen's objections, but nothing was done to resolve the issue and construction continued.

¶8 The significantly improved new dock generally followed the footprint of the old one, although its width was increased by at least one additional foot outward into the river. By the time construction wrapped up in April of 2006, a 2.6 by 3.69 foot section of the dock extended onto Pedersen's property. Throughout 2006, 2007, 2008, and part of 2009, the Ziehls used the dock for recreational purposes and boat parking. Pedersen occasionally used the dock when being picked up and dropped off by friends who boated to her residence. Pedersen and the Ziehls never discussed whether the Bysshes' original grant of permission to Nicodemus had subsequently been revoked or amended.

¶9 On March 4, 2009, Pedersen filed a complaint in the District Court for the Eleventh Judicial District, seeking to eject the Ziehls from her property, quiet title to the portion of the dock located on Lot 6A, and obtain an order that the Ziehls permanently remove that portion. The Ziehls answered and counterclaimed, arguing that they had acquired a prescriptive easement allowing them to maintain and use the entire dock. On January 18, 2011, the case was tried before the District Court, Hon. Stewart E. Stadler, presiding, sitting without a jury. After receiving evidence and the arguments of both parties, the District Court issued its Findings of Fact, Conclusions of Law, and Decree on November 26, 2012. The District Court ruled in favor of Pedersen, determining that the Ziehls did not hold a prescriptive easement and granting Pedersen's requested order. The Ziehls appeal.

4

**STANDARD OF REVIEW**

¶10    We affirm the factual findings of a district court sitting without a jury unless those findings are clearly erroneous.  M. R. Civ. P. 52(a); *Steiger v. Brown*, 2007 MT 29, ¶ 16, 336 Mont. 29, 152 P.3d 705 (citation omitted).  A district court's findings are clearly erroneous if they are not supported by substantial evidence, if the district court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed.  *Steiger*, ¶ 16 (citing *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, 53 P.3d 870).  We view the evidence in the light most favorable to the prevailing party when determining whether substantial credible evidence supports the district court's findings.  *Steiger*, ¶ 16 (citing *Ray*, ¶ 19).  We review a district court's conclusions of law to determine whether those conclusions are correct.  *Steiger*, ¶ 16 (citing *Ray*, ¶ 20).

**DISCUSSION**

¶11    *Did the District Court err by holding that the Ziehls failed to adversely use the dock for the required statutory period in order to obtain a prescriptive easement?*

¶12    The parties generally do not dispute the factual findings of the District Court. Indeed, the Ziehls concede that any minor factual issues do not affect our analysis on appeal.   The parties instead focus their arguments almost exclusively on the legal character of Nicodemus' and the Ziehls' use of the dock.  More specifically, the entire outcome of this case turns on whether Nicodemus' use of the dock after the Bysshes sold Lot 6A to Pedersen in 2002 was adverse or permissive.

5

¶13   A prescriptive easement arises by operation of law when a claimant proves that his or her use of another's property was open, notorious, exclusive, <u>adverse</u>, continuous, and uninterrupted for the statutory period. *Heller v. Gremaux*, 2002 MT 199, ¶ 12, 311 Mont. 178, 53 P.3d 1259 (emphasis added). Section 70-19-404, MCA, sets Montana's prescriptive period at five years. *See also* §§ 70-19-405, 23-2-322, MCA. If a claimant establishes the elements of open, notorious, exclusive, continuous, and uninterrupted, "a presumption arises that the use is adverse to the servient estate and the burden then shifts to the owner to show the use was permissive." *Combs-Demaio Living Trust v. Kilby Butte Colony, Inc.*, 2005 MT 71, ¶ 13, 326 Mont. 334, 109 P.3d 252. However, proof of permissive use overcomes the presumption of adversity and causes a prescriptive easement claim to fail. *Heller*, ¶ 15.

¶14   The Ziehls and Pedersen stipulated that use of the disputed portion of dock was open, continuous, and uninterrupted throughout the entire period that Nicodemus and the Ziehls owned Lot 7A. The other two elements necessary to raise the presumption of adverse use—notorious and exclusive—were not squarely addressed by the District Court. The Ziehls argue that both of these elements were also clearly satisfied and therefore this Court must presume adversity. While the Ziehls offer a technically correct theory, we need not here engage in a burden-shifting analysis. A demonstration of permissive use overcomes any presumption of adversity and defeats a prescriptive easement claim as a matter of law. On this point, the District Court concluded that Nicodemus used the dock at all times during his ownership of Lot 7A with permission. We agree.

6

### A. Permissive use

¶15   Under well-settled Montana law, use of another's property based on neighborly accommodation or courtesy does not give rise to a prescriptive easement because adversity is lacking. *Heller*, ¶ 14; *Rathbun v. Robson*, 203 Mont. 319, 323, 661 P.2d 850, 852 (1983).  Put another way, if permissive use is shown, "no easement can be acquired since the theory of prescriptive easements is based on adverse use." *Keebler v. Harding*, 247 Mont. 518, 521, 807 P.2d 1354, 1356 (1991); *Tanner v. Dream Island*, 275 Mont. 414, 424-25, 913 P.2d 641, 648 (1996).  "If a use begins as a permissive use it is presumed to continue as such." *Rettig v. Kallevig*, 282 Mont. 189, 196, 936 P.2d 807, 811 (1997) (quoting *White v. Kamps*, 119 Mont. 102, 114, 171 P.2d 343, 349 (1946)).  In fact, "[i]f the use begins as a permissive use, it cannot ripen into a prescriptive right, no matter how long it may continue, unless there is a distinct and positive assertion of a right hostile to the owner." *Morrison v. Higbee*, 204 Mont. 515, 520, 668 P.2d 1025, 1027 (1983).

¶16   In its Findings of Fact, the District Court found:

14. Judy Bysshe not only acknowledged the encroachment, she discussed it with her realtor and with Paul Nicodemus.  She clearly stated that her retained portion of the dock (on Lot 6A) was the property of 6A and use was to be shared and permissively used by each owner as a neighborly accommodation.

16. Nicodemus occasionally parked his boat at the dock and used it during his property ownership.

17. Gayle Pedersen began looking at Lot 6A in 2001.  Lot 6A was then a bare lot. [Pedersen] looked at the property a number of times, but never saw any use along the dock before her purchase.  She signed her purchase agreement in 2001 and closed her purchase on October 15, 2002. . . .

7

19. Although the dock was in deteriorated condition, the owners of Lot 7A were able to use the dock at times during their ownership.

21. Defendants Ziehl purchased Lot 7A from Nicodemus in August 2004. They used the existing dock in the summer of 2005 but did not undertake reconstruction of the riverfront or dock area until 2006.

24. Ziehls completed their dock reconstruction in April 2006, and used the dock in 2006, 2007, 2008 and minimally in 2009, for family recreation and for docking his boat between June and September of a given year.

28. No notice was ever provided by any party that the initial permissive and continuing use of the dock by the owners of Lot 6A and Lot 7A was altered or revoked.

Based on these findings and our case law regarding the continuing nature of permissive use, the District Court concluded that the Bysshes' original grant of permission to Nicodemus continued after Pedersen purchased Lot 6A from the Bysshes, and that Nicodemus enjoyed this permission until he sold Lot 7A to the Ziehls in August of 2004. The District Court was not convinced that the Bysshes' initial permission terminated even after Nicodemus sold Lot 7A, but determined that even if the Ziehls' use became adverse immediately upon acquiring Nicodemus' property, "there is not five years of adverse use between Defendant's purchase of Lot 7A in August 2004 and M[arch] 2009, when litigation was commenced." Pedersen urges us to uphold the District Court's decision for these same reasons and further contends that the Ziehls' use did not become adverse until Pedersen ordered Day to leave her property when the dock was being renovated in 2006—only three years prior to the commencement of this action, well short of the five year prescriptive period.

8

¶17    The Ziehls maintain that even though the Bysshes originally granted Nicodemus permission to use the dock in 2000, "Bysshe's permission ended when she sold the servient estate [Lot 6A] to Pedersen [in 2002]."  The Ziehls go on to explain that after acquiring the property, Pedersen never expressly authorized Nicodemus to use the dock. Therefore, Pedersen merely "acquiesce[d]" to Nicodemus' use, which is not the same thing as permission.  *See Cremer v. Cremer Rodeo Land & Livestock Co.*, 192 Mont. 208, 211, 627 P.2d 1199, 1201 (1981).  According to the Ziehls, Nicodemus' use from 2002 to 2004 should have been included by the District Court when calculating the period of adverse use—approximately seven years by the time litigation commenced in 2009.  In support of this argument, the Ziehls rely primarily on our decision in *Han Farms, Inc. v. Molitor*, 2003 MT 153, 316 Mont. 249, 70 P.3d 1238 for the proposition that "[o]ne owner's grant of permission does not continue by default to the next owner"—that is, the Bysshes' grant of permission to Nicodemus did not continue when Pedersen purchased Lot 6A.  Pedersen, in turn, argues that *Molitor* is irreconcilable with our body of permissive use law and should not control in this case.

¶18    In *Molitor*, Han Farms utilized a road that crossed Molitor's property to access Han Farms for residential and agricultural purposes.  *Molitor*, ¶ 7.  Certain tenants of Han Farms began using the road more frequently than in the past, prompting Molitor to withdraw permission.  *Molitor*, ¶ 8.  Han Farms brought suit claiming that it had acquired a prescriptive easement over Molitor's property.  At trial, Molitor testified that her predecessor in interest had given Han Farms' predecessor in interest permission to use the road.  *Molitor*, ¶ 14.

¶19    On appeal, we affirmed the district court's decision to grant Han Farms a prescriptive easement, explaining that although Molitor's predecessors in interest may have given Han Farms' predecessors in interest permission to use the road, the record contained no evidence that Molitor ever did, proving fatal to her defense. *Molitor*, ¶¶ 14-16.    As authority, we cited *Rettig*, 282 Mont. at 195, 936 P.2d at 811 for the blanket proposition that "[p]ermissive use is not transferable."    *Molitor*, ¶ 14.    However, as Pedersen correctly points out, *Rettig* did not create or adopt a non-transferability of permissive use rule.    In fact, *Rettig*'s discussion of the rule should have precluded its application in *Molitor*.

¶20    In *Rettig*, DeRudder gave his neighbor Englert permission to use a silage pit road that crossed his property.    *Rettig*, 282 Mont. at 191, 936 P.2d at 808.    Some years later, Englert decided to sell his property to the Rettigs.    Before the sale went through, DeRudder told Englert that any purchasers of Englert's property could continue to use the silage pit road, subject to his permission.    *Rettig*, 282 Mont. at 191, 936 P.2d at 808.    The Rettigs purchased Englert's property and used and improved the silage pit road for eleven years without ever receiving express permission from DeRudder to do so.    *Rettig*, 282 Mont. at 192, 936 P.2d at 809.    DeRudder eventually sold his property to the Kallevigs, who immediately informed the Rettigs that they could no longer use the road.    The Rettigs sued, claiming they had acquired a prescriptive easement.    *Rettig*, 282 Mont. at 192, 936 P.2d at 809.

¶21    The district court rejected the Rettigs' claim, and this Court affirmed.    We explained that the Rettigs did not acquire a prescriptive easement because permissive use,

10

once granted, is presumed to continue as permissive. *Rettig*, 282 Mont. at 196, 936 P.2d at 811. Indeed, "periodic, express grants of permission are not required to maintain the permissive character of the use . . . ." *Rettig*, 282 Mont. at 196, 936 P.2d at 811. We found it convincing that the Rettigs continued to use the road in the same manner as Englert, and DeRudder did not object. *Rettig*, 282 Mont. at 196, 936 P.2d at 811. More importantly, we specifically rejected the Rettigs' non-transferability of permissive use argument because that rule stands only for the proposition that "one who has received permission . . . may not transfer a 'limited personal right or license . . . to any other person or persons.'" *Rettig*, 282 Mont. at 195-96, 936 P.2d at 811 (citing *Luoma v. Donohoe*, 179 Mont. 359, 363, 588 P.2d 523, 525 (1978) in turn citing *Cope v. Cope*, 158 Mont. 388, 493 P.2d 336 (1971)). In other words, the rule provides that if you receive permission to use your neighbor's land, you cannot unilaterally extend that permission to others.

¶22 It is clear that *Molitor* incorrectly applied the non-transferability of permissive use rule. The issue in *Molitor* was not whether the dominant user could unilaterally transfer a permissive right of use to another—which is the nature and scope of the rule—but, rather, whether permission granted by the servient owner continued after the sale of the servient property. Indeed, contrary to *Molitor*'s blanket "permission does not transfer" holding, our other cases demonstrate that the approach of this Court is to examine the nature of the arrangement between the parties at the outset of the use in determining the extent and duration of permissive use. *Keebler*, 247 Mont. at 521-23, 807 P.2d at 1357-58 (concluding that historical uses and custom prior to Appellant's acquisition of the

11

property provided evidence that use had "always been permissive"); *Morrison*, 204 Mont. at 520-21, 668 P.2d at 1027-28 (construing use by Defendant's predecessors in interest as "indicat[ing] friendly cooperation between neighbors."); *Rathbun*, 203 Mont. at 322-23, 661 P.2d at 852 (determining that initial homesteader practices were "sufficient to support a use permissive in its inception and not under a claim of right"); *Cope*, 158 Mont. at 390-94, 493 P.2d at 338-40 (finding strong support for permissive use based on the actions of the families prior to Plaintiff's acquisition of the property, and stating "the courts look to a variety of acts [sic] and circumstances to determine whether the user in a particular case was adverse or permissive . . . .").

¶23    The Ziehls argue that our cases discussing the continuing nature of permissive use are factually distinguishable from the case at bar because they "involve continuous ownership of the servient estate by the same owner who initially gave permission, or . . . direct evidence of subsequent permission to a new owner." Certainly, neither of these scenarios exists in this case—the Bysshes did not maintain continuous ownership of the servient estate, and Pedersen never expressly granted Nicodemus permission to use the dock. Based on this factual distinction, the Ziehls urge us reject the permissive use line of precedent cited by Pedersen and instead apply the expansive rule stated in *Molitor*.

¶24    The facts in *Molitor* do appear very similar to the facts here, but, as we have explained, *Molitor* was premised upon an irrelevant principle of law, one which our prior cases neither recognized nor adopted in such a context. It makes little sense to follow a rule that clearly does not apply, based solely on factual similarities, when the weight of our existing law demands a contrary result. Thus, to the extent that *Molitor* determined

12

that permission can *never* carry over from one owner to another after sale of the servient property, it is overruled. "*[S]tare decisis* does not require that we follow a manifestly wrong decision." *Formicove, Inc. v. Burlington Northern, Inc.*, 207 Mont. 189, 194-95, 673 P.2d 469, 472 (1983). A thorough reading of our permissive use cases makes clear that this Court has always, with the exception of *Molitor*, considered the nature of the initial agreement and the attendant circumstances surrounding any continuing use when determining whether permission exists. This approach presents a more comprehensive and sound method of analyzing permissive use questions than ignoring case-specific facts and circumstances in favor of a rigid "permission never carries over" rule.

¶25 Resolving permissive use questions in this way does not result in "tacking" of permissive use periods, as the Ziehls describe Pedersen's position to be. We are not holding that permission given by the servient owner automatically continues after sale of the servient property. Such an approach could, by default, subordinate the intentions of current property owners to the intentions of their predecessors in title and produce absurd results in some cases. At the same time, it cannot be said that the weight of our law supports the inverse proposition that the mere sale of property, without more, automatically transforms permissive use into use that is adverse to the purchaser's ownership interest.

¶26 In its Findings of Fact, the District Court determined that Judy Bysshe expressly granted Nicodemus permission to use the dock, which he occasionally did throughout his ownership of Lot 7A. This finding is supported by substantial credible evidence in the record. The Ziehls attempt to undermine this finding by citing testimony from Judy

13

Bysshe about a conversation she had with Nicodemus wherein she stated: "[A]s far as [she] was concerned as long as we [Bysshes] owned [a portion of the dock] he [Nicodemus] was welcome to use it, and if somebody else owned it he'd have to work out an arrangement to share the space." The Ziehls argue that this statement expressly limited Nicodemus' permission to the Bysshes' term of ownership. We do not agree. The fact that Judy Bysshe mentioned that Nicodemus would have to work out an arrangement with a new owner at some point in the future does not make the District Court's finding that permission existed at all times during Nicodemus' use of the dock clearly erroneous. Importantly, the District Court did not find, and the Ziehls do not argue, that Nicodemus ever changed the character of his use or took active steps to claim the entire dock as a matter of right. It is telling that Pedersen never even saw Nicodemus use the dock in 2003 and 2004. Our decision in *Morrison* makes quite clear that in order to transform a permissive use into an adverse one, there must be a "<u>distinct</u> and <u>positive</u> <u>assertion</u> of a right hostile to the owner." *Morrison*, 204 Mont. at 520, 668 P.2d at 1027 (emphasis added). As the District Court reasoned, "[t]here was no 'overt act' or event which would notify Bysshes or Pedersen that either owner of Lot 7A claimed the use of the full dock as their right." Given these facts, we cannot conclude that the mere sale of Lot 6A to Pedersen in 2002, without more, changed Nicodemus' occasional use of the dock, which had at all times previously been permissive, into an adverse and hostile claim of right.

¶27 Since we have determined that Nicodemus used the dock with permission at all times during his ownership of Lot 7A, there is no need to pinpoint the exact date when

14

the Ziehls' use became adverse. As the District Court correctly decided, even if the Ziehls' use became adverse immediately upon purchasing Lot 7A in August of 2004, the statutorily imposed five-year adversity period had not yet elapsed by the time litigation commenced in March of 2009.

¶28    Accordingly, the Judgment of the District Court is affirmed.


/S/ JIM RICE


We concur:


/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ BRIAN MORRIS