DA 13-0472

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 186

LYLE PHILLIPS, ANNE DEE RENO,
TURNER ASKEW, and BEN WHITTEN,

        Plaintiffs and Appellees,

    v.

CITY OF WHITEFISH,

        Defendant, Third-Party
        Plaintiff, and Appellant,

    and

THE BOARD OF COMMISSIONERS OF
FLATHEAD COUNTY,

        Defendant, Third-Party
        Defendant and Appellee,

    and

DAN WEINBERG and ED McGREW,
individually and on behalf of LET
WHITEFISH VOTE, a ballot committee
lawfully organized under the laws of
Montana; MARY PERSON and
MARILYN R. NELSON,

        Intervenors and Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                  In and For the County of Flathead, Cause No. DV-11-1535D
                  Honorable David M. Ortley, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Terry N. Trieweiler (argued); Trieweiler Law Firm; Whitefish, Montana
(for City of Whitefish)

Mary E. VanBuskirk; Whitefish City Attorney; Whitefish, Montana
(for City of Whitefish)

John F. Lacey (argued); McGarvey, Heberling, Sullivan and McGarvey,
P.C.; Kalispell, Montana (for Dan Weinberg, et al.)

For Appellees:

Alan F. McCormick (argued); Garlington, Lohn & Robinson, PLLP;
Missoula, Montana (for Board of Commissioners)

Duncan Scott (argued); Scott & Kienzle, P.A.; Kalispell, Montana
(for Lyle Phillips et al.)

_____

Argued: April 11, 2014
Submitted: April 23, 2014
Decided: July 14, 2014

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Dan Weinberg, Ed McGrew, Let Whitefish Vote, Mary Person, and Marilyn Nelson (collectively Intervenors), and City of Whitefish (City) appeal from the order of the Eleventh Judicial District Court, Flathead County, granting summary judgment to Lyle Phillips, Anne Dee Reno, Turner Askew, and Ben Whitten (collectively Plaintiffs) and the Board of Commissioners of Flathead County (County). Plaintiffs filed this action after voters in Whitefish passed a referendum repealing Resolution 10-46, which authorized the City to enter into an interlocal agreement with the County concerning planning and zoning authority over a two-mile area surrounding the City, commonly referred to as the extraterritorial area (ETA), or the "donut." On cross-motions for summary judgment, the District Court held that the Resolution was not subject to the right of voter initiative and referendum. The following issues have been raised on appeal:

¶2 *1. Did the District Court err by not dismissing the suit as untimely?*

¶3 *2. Did the District Court err by determining that Resolution 10-46 was an administrative act by the City that was not subject to repeal by referendum?*

¶4 *3. If Intervenors are entitled to summary judgment and the referendum is valid, is the 2005 Interlocal Agreement restored?*

¶5 We affirm the District Court on issues one and two, and do not reach issue three.

3

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 A city may adopt a growth policy and implement zoning and subdivision regulation in an area beyond the city limits only if the county has not "adopted zoning or subdivision regulations" in that area. Section 76-2-310(1), MCA. Likewise, a city may enforce its zoning and subdivision regulations in the extended area only "until the county board adopts a growth policy . . . and accompanying zoning or subdivision resolutions that include the area." Section 76-2-311(1), MCA. Thus, by statute, a city's authority to zone and regulate outside its boundaries is limited to instances where the county has not exercised its authority, and only until the county does so.

¶7 State law also provides geographical limits for a city's exercise of zoning and subdivision authority outside its boundaries. As a city designated by statute of the second class, according to its population, § 7-1-4111(2), MCA, Whitefish could extend its regulations for up to two miles beyond the city limits, § 76-2-310(1)(b), MCA. State law also allows local governments to create joint planning boards, § 76-1-112(1), MCA, and to enter into interlocal agreements concerning joint provision and maintenance of various services, § 7-11-104, MCA.

¶8 The history of this matter begins in 1967, when the City and County jointly created the Whitefish City-County Planning Board (Planning Board). The Planning Board was given planning jurisdiction over the area extending four and one-half miles from city limits, and the City exercised exclusive zoning authority in the area up to one mile beyond city limits, in accordance with then-applicable law and the consent of the

4

County. These jurisdictional areas for planning and zoning were set without a formal interlocal agreement.[1]

¶9 In 2005, after two years of negotiation, the City and County entered a formal agreement. This 2005 interlocal agreement (2005 IA) reduced the Planning Board's jurisdictional area from four and one-half miles to two miles outside the city limits, while providing for the City's exclusive authority to establish and enforce zoning, subdivision, floodplain, and lakeshore protection regulations, as well as authority to adopt and amend a growth policy, for an area two miles beyond the city limits. By its terms, the 2005 IA could not be altered or terminated without the mutual consent of the parties.

¶10 In 2008, the City adopted the Critical Areas Ordinance (CAO), which imposed zoning restrictions in the donut to protect lakes, streams, wetlands, and drainage areas from development. The County opposed the CAO and advised the City that if it was adopted, the County would withdraw from the 2005 IA. Following the adoption of the CAO, the County passed a resolution to withdraw from the 2005 IA. The City filed a lawsuit (2008 lawsuit) that sought to uphold the 2005 IA, and for a declaration that the County could not unilaterally withdraw from the agreement. The County countered that the mutual consent provision for termination in the 2005 IA was unenforceable because it did not address duration as required by the Interlocal Agreement Act, and thereby permanently prevented the County from adopting regulations for the donut as authorized

---

[1] The record reflects that the joint Planning Board still exists, although its function remains unclear. The Planning Board's status is not raised as an issue herein.

5

by state law. The County, and intervenors in that case, also argued that the 2005 IA was an unconstitutional delegation of authority from the County to the City, and that interlocal agreements were only allowed for provision of services rather than legislative matters. The District Court denied a preliminary injunction that would have prevented the County from taking any planning or zoning action in the donut during the pendency of the lawsuit, and summarily declared the 2005 IA to be unenforceable. On appeal, this Court reversed that ruling as a premature decision on the merits, entered an injunction, and remanded for trial. *City of Whitefish v. Bd. of Co. Commrs. of Flathead Co.*, 2008 MT 436, ¶¶ 17-18, 347 Mont. 490, 199 P.3d 201.

¶11    After remand, the City and County sought an extension of time from the District Court to allow opportunity for settlement discussions. The parties created a joint committee of elected officials and City and County residents (resolution committee) to attempt to resolve the issues by negotiation. Over approximately eight months, the resolution committee held ten public meetings and ultimately proposed amendments to the 2005 IA[2] to provide County oversight of the City's exercise of zoning jurisdiction in the donut, allow either party to terminate the IA after giving one year's notice and participating in alternative dispute resolution (ADR), and set a five-year duration term subject to renewal by the parties. As the City and County both had to agree, the proposed

---

[2] The parties disagree about whether the changes were merely amendments to the existing 2005 IA or constituted a new and distinct agreement. Because we do not find this issue to be determinative, and only select provisions of the agreement contained any changes, we refer herein to the changes as amendments. However, for ease of understanding, we refer to the amended agreement, entered into in 2010, as the 2010 IA.

6

changes were further discussed at public meetings of the City Council and County Commissioners. The City formally undertook consideration of the new agreement (2010 IA) by way of Resolution 10-46. On November 15, 2010, the City Council passed Resolution 10-46, which authorized the City Manager to sign the 2010 IA on behalf of the City. At the same meeting, the City Council passed Resolution 10-47, which authorized the City to seek dismissal of the 2008 lawsuit. On November 30, 2010, the County Commissioners adopted a resolution identical to Resolution 10-46 authorizing the County to enter the 2010 IA. As required by the 2010 IA, the City and County filed a joint motion to dismiss the 2008 lawsuit, offering to the District Court that the litigation was moot because the 2010 IA was fully in effect and specifically replaced the 2005 IA. Intervenors in that case opposed dismissal. The District Court dismissed the action on July 11, 2011, reasoning that the 2010 IA had rendered the 2005 IA void and resolved the issues between the parties.

¶12 After passage of Resolutions 10-46 and 10-47 by the City Council, citizens who would become Intervenors in this case, and other City residents unhappy with the decision, began collecting signatures to put a referendum on the ballot to repeal Resolution 10-46, which had authorized the City to enter the 2010 IA. The referendum petition was approved as to form and compliance with state law on January 11, 2011. Sufficient signatures were gathered, and on April 24, 2011, the County Election Department certified the ballot measure for the November election. The Referendum explained that the 2010 IA permitted termination by either party without cause, but did

7

not reference Resolution 10-47 or the dismissal of the 2008 lawsuit. In light of the development of this challenge to the 2010 IA and the likelihood of further legal disputes, the County passed a resolution on June 22, 2011, giving notice to the City that it was withdrawing from the 2010 IA.

¶13 The Referendum seeking repeal of Resolution 10-46 was placed on the ballot and voted on by City residents. Citizens residing in the donut were not permitted to vote on the Referendum. The Referendum passed by a two-to-one margin in the November 2011 election. Following the election, the City deemed the 2010 IA as rescinded and no longer in effect. The City further took the position that after the 2010 IA was revoked, the 2005 IA was reinstated in its entirety, and the City was authorized once again to exercise exclusive jurisdiction in the donut.

¶14 The present lawsuit challenging the validity of the Referendum was filed by Plaintiffs, residents of both the City and the County, on December 20, 2011, four days after the Flathead County Clerk and Recorder certified the results of the Referendum. Plaintiffs claimed the citizens' power of referendum and initiative did not extend to Resolution 10-46 because the decision to enter into the agreement was contractual and administrative in nature. The City filed a third-party complaint against the County, alleging that the County breached the 2010 IA by taking steps to adopt zoning regulations prior to the expiration of the one-year notice period and, on the assumption that the 2005 IA had been reinstated, that the County had breached the 2005 IA by unilaterally withdrawing from it. The County counter-claimed against the City, alleging it breached

8

the 2010 IA by failing to carry out the required mediation process, and that such breach excused the County from any further performance under the 2010 IA. The District Court granted an unopposed motion to intervene by the Intervenors, who sought to defend the citizens' passage of the Referendum. Intervenors asserted the suit should be dismissed as untimely because of Plaintiffs' failure to bring the action within 14 days of approval of the referendum petition, citing § 7-5-135(1), MCA, and the doctrine of laches. The District Court granted Intervenors' motion for an injunction, on stipulation of the City and the County, enjoining the County from taking any action to adopt a County growth policy, zoning regulations, or subdivision regulations for the donut pending further order of the court.

¶15 The District Court determined the suit was timely because the 14-day timeframe in § 7-5-135(1), MCA, only applied to the "governing body," and no statute provided a deadline for citizens to file a challenge to a referendum. The court did not separately consider the doctrine of laches. On cross-motions for summary judgment, the District Court determined Resolution 10-46 was an administrative act and therefore not subject to the power of referendum and initiative. The court granted summary judgment for Plaintiffs and the County. Intervenors and the City appeal.

**STANDARD OF REVIEW**

¶16 We review a district court's grant of summary judgment de novo, using the same M. R. Civ. P. 56 criteria applied by the district court. *Harris v. State*, 2013 MT 16, ¶ 11, 368 Mont. 276, 294 P.3d 382. A moving party is entitled to summary judgment when the

9

party "demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law." *Harris*, ¶ 11. "[T]he fact that both parties moved for summary judgment does not establish the absence of genuine issues of material fact." *Steadele v. Colony Ins. Co.*, 2011 MT 208, ¶ 14, 361 Mont. 459, 260 P.3d 145. Rather, we must carefully evaluate each motion on its own merits. *Steadele*, ¶ 14. In the present case, we agree with the parties that there are no genuine issues of material fact, leaving only the question of entitlement to judgment as a matter of law. Questions of law are reviewed to determine if the district court's conclusions are correct. *Harris*, ¶ 11.

¶17 The City argues that we must give the Referendum a "presumption of constitutionality and validity" because after passage it was a legislative enactment and must be afforded the same presumption granted to a law enacted by the Legislature. *See Ravalli Co. v. Erickson*, 2004 MT 35, ¶ 17, 320 Mont. 31, 85 P.3d 772 ("constitutionality of an enacted legislative statute is prima facie presumed"); *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶ 33, 315 Mont. 107, 67 P.3d 892. Based on this presumption, the City argues we must apply an "unconstitutional beyond a reasonable doubt" standard. *See Ravalli Co.*, ¶ 17 ("A party challenging the constitutionality of a statute must prove the statute unconstitutional beyond a reasonable doubt."); *Hardy*, ¶ 33. While we have previously determined that this standard does not apply to *proposed* ordinances and referendums, *Ravalli Co.*, ¶¶ 17-18, we have not directly addressed its application to referendums or initiatives after they have been passed. Here, the

10

Referendum rescinded a prior action; it did not create a new law or dictate a future action. Additionally, to deem the Referendum a "validly passed legislative enactment" would put the analytical cart before the horse where the central issue before us is the validity of the Referendum in rescinding Resolution 10-46. We therefore conclude that this standard is not appropriate here, and instead review the District Court's conclusions of law regarding the character of Resolution 10-46, which, in turn, determines the legality of the Referendum, for correctness.

## DISCUSSION

¶18    *1. Did the District Court err by not dismissing the suit as untimely?*

**A. Were Plaintiffs required to challenge the proposed referendum within 14 days of the petition being approved?**

¶19    Section 7-5-135(1), MCA, provides that "[t]he governing body may direct that a suit be brought in district court by the local government to determine whether the proposed action [in an initiative or referendum] would be valid and constitutional. The suit must be initiated within 14 days of the date a petition has been approved as to form under 7-5-134." No statute governs when a non-government party, such as a private citizen, must file suit to challenge an initiative or referendum. However, Intervenors and the City argue that because Plaintiffs relied on § 7-5-131 et seq., MCA, the deadline for filing a challenge provided in § 7-5-135(1), MCA, applies. The District Court held this argument was "not well taken," as the language of the statute applies only to local governments, and because the argument on timeliness was abandoned by not making "reference in its reply brief to this issue." Although we disagree with the court's

11

reasoning that failure to address the issue again in a reply brief waives the argument, we agree with the court's ultimate conclusion.

¶20 When interpreting a statute, it is the Court's obligation to construe it according to its plain meaning. *Ravalli Co.*, ¶ 11. This Court can neither insert what has been omitted, nor omit what has been inserted. *City of Missoula v. Cox*, 2008 MT 364, ¶ 11, 346 Mont. 422, 196 P.3d 452 (citing § 1-2-101, MCA). The plain language of § 7-5-135(1), MCA, limits application of the 14-day deadline for filing a challenge to "the local government." In this case the local government would presumably be the City, which chose not to file suit but instead proceeded in accordance with the ballot measure. The instant case was filed by private citizens after the City failed to do so. No statute places a time limit on a challenge brought by private citizens, and no argument has been made that such a challenge is not permissible. Because § 7-5-135(1), MCA, does not apply, the District Court did not err by concluding the filing of this case was not in violation of the 14-day deadline provided by the statute.

**B. Was the suit untimely based upon the doctrine of laches?**

¶21 Intervenors also argued that the doctrine of laches required dismissal of the suit as untimely. The District Court did not specifically address this argument.

¶22 Laches is an equitable doctrine by which a court may deny relief to a party who has "unreasonably delayed or been negligent in asserting the claim, when the delay or negligence has prejudiced the party against whom relief is sought." *Montanans v. State ex rel. McGrath*, 2006 MT 277, ¶ 23, 334 Mont. 237, 146 P.3d 759 (citing *Black's Law*

12

*Dictionary* 879 (Bryan A. Garner ed., 7th ed., West 1999)). For laches to apply, there must be a showing "that the passage of time has prejudiced the party asserting laches or has rendered the enforcement of a right inequitable." *Cole v. State ex rel. Brown*, 2002 MT 32, ¶ 25, 308 Mont. 265, 42 P.3d 760 (citing *Kelleher v. Bd. of Soc. Work Examrs.*, 283 Mont. 188, 191, 939 P.2d 1003, 1005 (1997) (internal citations omitted)).

¶23 In *Cole*, we applied the doctrine of laches to dismiss a suit brought by citizens alleging procedural defects in a term-limit initiative that had been voted on and passed nine years earlier. We noted that allowing the challenge to proceed at such a late stage "would prejudice those who have relied upon its presumptive validity," including at least some executive officers and state legislators who left office based upon that presumed validity. *Cole*, ¶ 32.

¶24 Intervenors focus on the failure of Plaintiffs to file sooner, but fail to address the laches requirement of prejudice. While Intervenors assert that the suit *could* have been brought earlier, they fail to provide support for why the suit *must* have been brought earlier. Intervenors point to cases in which this Court has allowed a pre-election challenge to be heard, such as *Reichert v. State ex rel. McCulloch*, 2012 MT 111, ¶ 59, 365 Mont. 92, 278 P.3d 455 (in the event that a challenged measure is facially defective, "the courts have a duty to exercise jurisdiction and declare the measure invalid"), and *Ravalli Co.*, ¶ 19 (holding § 7-5-135(1), MCA, requires review of the constitutionality of the substance of a proposed initiative). While these cases speak to the courts' duty to hear a pre-election challenge of a facially defective ballot initiative or referendum when

brought, they do not impose a duty upon citizens to bring a pre-election challenge or lose the opportunity to do so.

¶25    Intervenors offer that by the time the vote was conducted,

> (a) referendum supporters had successfully campaigned for repeal; (b) taxpayers had to bear the cost of the referendum, and election officials were forced to administer it; and (c) perhaps most importantly, they as opponents of the referendum had tried but failed to defeat the referendum in their own first-bite effort at the ballot box.

Intervenors conclude by arguing that equity favors the "more than 1,400 City voters who exercised their constitutionally-protected rights, [over] the few Plaintiffs (and their counsel) who indisputably delayed without cause and initiated this lawsuit several months after it could have been raised."

¶26    While the election process certainly resulted in both a financial and time cost to citizens and taxpayers, such a cost is inherent in any election. To adopt the position advocated by Intervenors would be tantamount to requiring all challenges to a ballot measure be brought prior to election. Such a rule cannot be supported based upon the limited protections available under the doctrine of laches.

¶27    We conclude that filing a legal challenge to the Referendum four days after the results were certified was not an unreasonable delay or negligent assertion of rights sufficient to warrant dismissal based upon laches, where there has been no demonstration of prejudice or inequity aside from the ordinary cost of the election process. Contrary to Intervenors' assertion, this holding does not provide "disgruntled citizen[s] . . . a completely open-ended and unchecked window of time to challenge a local referendum

14

or initiative effort." Laches is an equitable doctrine that is dependent on the factual circumstances. Here, there has not been a demonstration of necessary prejudice or inequity to warrant dismissal under the doctrine.

¶28 *2. Did the District Court err by determining that Resolution 10-46 was an administrative act by the City that was not subject to repeal by referendum?*

¶29 The powers of government are separated into three branches: legislative, executive, and judicial. Mont. Const. art. III, § 1. At the state level, the separation of powers clause prohibits any person belonging to one branch from exercising any power belonging to either of the others, unless the Constitution expressly provides otherwise. Mont. Const. art. III, § 1. The power to make and repeal laws resides in the legislative branch. Mont. Const. art. V, § 1. The Montana Constitution also "reserves to the people of this State the powers to challenge and enact laws through the referendum and initiative processes." *Whitehall v. Preece*, 1998 MT 53, ¶ 15, 288 Mont. 55, 956 P.2d 743 (citing Mont. Const. art. V, § 1 ("The people reserve to themselves the powers of initiative and referendum.")). This power of referendum and initiative is limited to "any act of the legislature except an appropriation of money." Mont. Const. art. III, § 5(1). No similar power is granted over acts of the judiciary or the executive branch.

¶30 In contrast to the powers of state entities, "[l]ocal governing bodies are empowered to exercise legislative, administrative, and other powers pursuant to Article XI, Section 4, Mont. Const." *Whitehall*, ¶ 19. Article XI, Section 8 requires the Legislature to extend the power of referendum and initiative "to the qualified electors of each local government unit." The Legislature has codified the power of referendum over

15

the actions of local governments in § 7-5-131, MCA, which provides that "[r]esolutions and ordinances *within the legislative jurisdiction and power* of the governing body of the local government" may be repealed by referendum. (Emphasis added.)

¶31 In *Whitehall*, ¶ 17, we explained that "[t]his Court has long recognized a distinction between legislative and administrative or quasi-judicial acts in relation to the powers of initiative and referendum; legislative acts have been held subject to referendum, while administrative or quasi-judicial acts have not." This distinction "applies in virtually all other jurisdictions" and is based upon the "sound rationale" that "referenda on executive and administrative actions would hamper the efficient administration of local governments." *Whitehall*, ¶ 21 (quotation omitted). The efficiency rationale is balanced against the obligation to broadly construe initiative and referendum powers to maintain maximum power in the people. *Whitehall*, ¶ 18. Thus, fundamentally, whether the citizens of Whitefish had the ability by referendum to repeal Resolution 10-46 hinges on whether the action by the City was administrative or legislative in nature.

¶32 As an initial matter, the City offers the argument that § 7-5-131, MCA, and the *Whitehall* distinction between a legislative versus administrative act of a local government are unconstitutional. The argument rests entirely upon the special concurrence of Justice Nelson in *Greens at Fort Missoula, LLC v. City of Missoula*, 271 Mont. 398, 897 P.2d 1078 (1995). In *Greens*, Justice Nelson argued that the Constitution did not contain language distinguishing a "legislative act versus administrative or quasi

16

judicial act," and that the Court's recognition of such a distinction violated rules of construction. *Greens*, 271 Mont. at 408, 897 P.2d at 1083 (Nelson, J., concurring). Plaintiffs and the County counter that this argument by the City is impermissibly raised for the first time on appeal and without giving notice to the Attorney General's office as required by M. R. Civ. P. 5.1(a) and M. R. App. P. 27. We agree, and further note that the Court addressed this argument in *Whitehall*, ¶¶ 17-25, wherein we declared the statute to be constitutional and "reaffirm[ed] that under Montana's Constitution, the people have retained the powers of initiative and referendum as to legislative acts only." Justice Nelson changed his position in *Whitehall*, stating that having "the benefit of extensive briefing and oral argument on the issue, I agree that my concurrence in [*Greens*] did not correctly interpret the phrase 'any act of the legislature.'" *Whitehall*, ¶ 42 (Nelson, J., concurring).

¶33 Though it is easy to state a rule recognizing the power of referendum or initiative over legislative matters and rejecting such power over administrative matters, determining whether a particular local government action is legislative or administrative can be difficult. We noted in *Whitehall*, ¶ 26, that the "denomination of an act of local government as a resolution or as an ordinance is not dispositive as to whether the act is legislative or administrative; that determination is fact-driven." We then adopted guidelines stated by the Supreme Court of Kansas to aid in distinguishing legislative and administrative acts of government. These guidelines are:

17

1. An ordinance that makes new law is legislative, while an ordinance that executes an existing law is administrative. Permanency and generality are key features of a legislative ordinance.

2. Acts that declare public purpose and provide ways and means to accomplish that purpose generally may be classified as legislative. Acts that deal with a small segment of an overall policy question generally are administrative.

3. Decisions which require specialized training and experience in municipal government and intimate knowledge of the fiscal and other affairs of a city in order to make a rational choice may properly be characterized as administrative, even though they may also be said to involve the establishment of a policy.

4. No one act of a governing body is likely to be solely administrative or legislative, and the operation of the initiative and referendum statute is restricted to measures which are quite clearly and fully legislative and not principally executive or administrative.

*Whitehall*, ¶ 28 (quoting *Wichita v. Kan. Taxpayers Network*, 874 P.2d 667, 671-72 (Kan. 1994)).

¶34 Encapsulating the issue, the fourth guideline posits that an act of a governing body is not likely to be either solely legislative or solely administrative, underscoring that these cases are not black and white, and contain a mixture of considerations. *See McAlister v. City of Fairway*, 212 P.3d 184, 193 (Kan. 2009) (quoting *Rauh v. City of Hutchinson*, 575 P.2d 517, 523 (Kan. 1978)) ("'the determination of whether a municipality has acted in its legislative or administrative capacity is indeed difficult and by no means consistent. Each case must be determined on its particular facts and even then there is no unanimity of opinion.'"). Referendum is to be restricted to acts that have a "fully" legislative purpose, and are not "principally" administrative. This overarching principle prompts the

18

parties' arguments over what Resolution 10-46 and the 2010 IA actually were and actually did—their substance and effect.

¶35　Plaintiffs argue that the 2010 IA and Resolution 10-46, which approved the IA, constituted a settlement agreement for the 2008 lawsuit because dismissal of the lawsuit was the consideration for entering the agreement. They also note that only those provisions of the 2005 IA that were challenged in the 2008 lawsuit were changed by the 2010 IA. Intervenors and the City argue that the District Court erred by concluding that Resolution 10-46 approved the 2010 IA in order to settle the lawsuit. They assert that only Resolution 10-47 concerned settlement of the lawsuit, while Resolution 10-46 was separate and distinct from the settlement.

¶36　A review of the record reveals that Resolution 10-46 states five times that the 2010 IA was being entered for the purpose of settling the 2008 lawsuit. Resolution 10-46 begins by noting that the City and County "have conducted extensive negotiations regarding modifications to the [2005 IA] concerning the City's Extraterritorial Planning and Zoning Jurisdiction *and resolution of the lawsuit*." (Emphasis added.) It further states that "*in consideration for the dismissal of the lawsuit* between the City and the County and in reliance of and anticipation of the dismissal, the parties agreed to amend the Interlocal Agreement a third time [by the proposed 2010 IA]." (Emphasis added.) Resolution 10-47 adds that the 2010 IA was entered "*in consideration for the dismissal of the lawsuit . . .* and in reliance of and anticipation for the dismissal." (Emphasis added.)

19

The 2010 IA itself explains that the changes in the 2005 IA were being made in consideration for settling the lawsuit.

¶37    The record from the November 1, 2010 City Council meeting that addressed Resolution 10-46 indicates that the amendments to the 2005 IA were recommended by the joint City and County committee that was created to find "options and ways to settle the current lawsuit regarding the [IA]." The minutes note the City and County conducted joint work sessions "to consider the various amendments to the IA, their separate interests, concerns, and mutual interests to resolve the litigation." As recorded, the Council's discussion at the November 1st meeting of then-proposed Resolution 10-46 was almost exclusively directed toward the settlement of the lawsuit, including what language should be added to the IA and what process should be utilized in order to ensure the lawsuit was dismissed despite the opposition from intervenors in that case. The minutes state:

> the City and County [have] several options to ensure that their adoption of a new IA ends the lawsuit. We felt the City and County could agree to dismiss the lawsuit and then sign the new IA after the litigation is dismissed. Or we could add language in the new IA to memorialize our agreement to work together in a cooperative effort and end the litigation. In consideration of resolving the litigation we have agree[d] to the third amendments to the 2005 [IA]. [City Attorney VanBuskirk] said she would work with the County to prepare language for the 3rd amendment to the IA to reflect that in consideration for settling the lawsuit the City and County have agreed to the new terms of the 2005 IA . . . . The timing of the dismissal of the lawsuit would follow the actual execution of the [2010 IA].

20

¶38 The minutes explain that this language was critical because if the lawsuit was not dismissed, the 2010 IA would lack consideration and the litigation over the 2005 IA could continue:

> However, if the Court doesn't dismiss the lawsuit because of the Intervenors' position*, the lawsuit would continue on the present litigation issues based on the 2005 Interlocal Agreement.*
>
> . . .
>
> . . . Attorney VanBuskirk said the new IA should contain the language that in consideration of the dismissal of the lawsuit, the parties agreed to the terms of the new IA. *If the lawsuit is not dismissed then it would not be advisable to waive their opportunity to continue the litigation in support of the 2005 agreement.*

(Emphasis added.) The minutes further demonstrate that the lawsuit was a dominant topic of discussion in the Council's decision to approve the new IA at the meeting where it was passed. It is clear that the settlement of the lawsuit and the approval of the 2010 IA by the Council, as implemented by Resolution 10-46, were inextricably tied together. Although Resolution 10-47 technically authorized the City to seek dismissal of the 2008 lawsuit, approval of the 2010 IA by Resolution 10-46 was expressly conditioned upon such dismissal and would not have been honored by the City if dismissal had not been granted by the court. Plaintiffs are correct that, beyond authorization to enter the 2010 IA, Resolution 10-46 was substantially related to the agreement to settle the 2008 lawsuit over the 2005 IA.

¶39 The first *Whitehall* guideline recognizes that legislative actions are typically permanent or general in character while those actions that are temporary or limited in effect are administrative. If the action declares a new policy or plan it is generally

21

legislative. If the action pursues a plan previously adopted by the local government, or by a superior legislative body, it is administrative. *Whitehall*, ¶ 28.

¶40 City and Intervenors contend that the 2010 IA constituted a new policy that made significant, generally applicable changes to land-use and zoning policies. They argue that by eliminating the mutual consent provision, and allowing the County to withdraw for any reason with only one year's notice, the City "relinquished its sole jurisdictional authority over the ETA" and "in essence transferred control of planning and zoning in the ETA from the City to the County." Because of the potential impact on zoning and planning, the City argues that our holding in *Greens* is dispositive.

¶41 In *Greens*, after Fort Missoula was purchased by a private developer and annexed to the city of Missoula, the city enacted an ordinance that rezoned the Fort to allow residential housing. *Greens*, 271 Mont. at 400, 897 P.2d at 1079. We affirmed that the ordinance was legislative, and subject to the power of referendum, because rezoning and zoning are equally legislative in character. *Greens*, 271 Mont. at 405-06, 897 P.2d at 1082. *See also Plains Grains L.P. v. Bd. of Co. Commrs. of Cascade Co.*, 2010 MT 155, ¶ 21, 357 Mont. 61, 238 P.3d 332 ("zoning designations are legislative acts"); *North 93 Neighbors, Inc. v. Bd. of Co. Commrs. of Flathead Co.*, 2006 MT 132, ¶ 18, 332 Mont. 327, 137 P.3d 557 ("Amending a growth policy or a zoning designation constitutes a legislative act.").

¶42 However, *Greens* and other cases holding zoning decisions to be legislative are not determinative here. Resolution 10-46 and the 2010 IA are not zoning ordinances;

22

they do not actually zone or rezone any property, or make any such land-use decisions. It is important to recognize, as explained above, that any planning authority the City could hope to exercise in the donut was subject to the County's primary statutory authority to act. Sections 76-2-310(1), -311(1), MCA. Although we are not deciding in this case whether zoning authority was the proper subject of an interlocal agreement, nonetheless the action here was simply an amendment to an interlocal agreement that had provided, at most, consensual authority from the County for the City to act. Not only did the IA amendments not actually zone, but they also did not alter the contractual designation of which local government had current authority to zone in the donut. Land-use authority in the donut under the 2010 IA remained with the City, while an unspecified power of oversight in the County was added.[3] What the amendments did was to provide a new mechanism that could potentially lead to a change in the City's permissive authority in the future, including ultimate termination of the interlocal agreement between the City and County. Generally, a municipality has the same general power of contract, including the power to settle a dispute over the contract, as do private individuals. *Cincinnati ex rel. Ritter v. Cincinnati Reds*, 782 N.E.2d 1225, 1236-37 (Ohio App. 1st Dist. 2002) (citing 56 Am. Jur. 2d *Municipal Corporations, Counties, and Other Political Subdivisions* § 758 (2000)); *Oakman v. City of Eveleth*, 203 N.W. 514, 517 (Minn. 1925)

---

[3] The 2010 IA did not provide a mechanism for County oversight of City zoning in the donut, or specify the County's powers in the event of an objectionable action by the City, except for the process of terminating the agreement entirely.

(action of municipality in settling a lawsuit is an exercise of already existing law, not new law).

¶43 The parties' arguments overlap into the second guideline—whether an action is one declaring a public purpose or only a small segment of a policy question. The City and Intervenors contend that the 2010 IA effectively brought about a broad alteration in land-use authority in the donut broadly because the termination provision rendered the City's authority illusory—subject only to the County's whims. However, this argument requires speculation beyond the record. As contemplated by the 2010 IA, in order for authority to transfer from the City, the County had to give notice of its intent to terminate the agreement and then participate in ADR to resolve issues between the parties while continuing under the IA. Only after a one-year period and the failure of the ADR process was the IA to be terminated. Even without the IA in place, the City had the power under § 76-2-311, MCA, to zone in the donut up until the County determined to adopt its own regulations. Because such action, under the IA, could not take place during the one-year dispute resolution period, the City's authority would continue until the County completed the process of planning and enacting its own regulations. Put another way, there would be a change in zoning policies in the donut only *if* the County gave notice to terminate, *if* the ADR process failed, *if* the County initiated planning and adopted new regulations for the donut, and, ultimately, *if* those regulations were inconsistent with the regulations the City had enacted. Setting aside the fact that the purpose of the 2010 IA was to settle litigation, on this record it is difficult to conclude that the 2010 IA itself effectuated a

24

new zoning policy. Rather, an agreed-upon process between two local governments was established that *could* lead to a future change in policy after the IA had run its course.

¶44 *Whitehall* is instructive. There, the town was required by the Public Service Commission to explore options for reducing its water consumption. The town had a flat-rate billing system for water and did not monitor individual usage. The town passed resolutions approving submission of an application to a grant program; authorizing the town to borrow funds from a U.S. Department of Agriculture program; and authorizing the mayor to enter into a contract for additional grant funding to fund a water system improvement project. *Whitehall*, ¶ 6. Subsequently, the town passed an ordinance requiring a water meter to be installed for each water user, and providing that water use would be billed based on actual use rather than by flat rate. *Whitehall*, ¶ 7. Citizens attempted to place a referendum on the ballot to repeal the ordinance requiring water meters and use billing, and the town council filed suit challenging the proposed referendum. *Whitehall*, ¶¶ 8-9. We found the first guideline to be inconclusive because, while previous enactments set out the overall purpose of pursuing a water improvement project, the requirement for installing a water meter was added for the first time in the challenged ordinance. *Whitehall*, ¶¶ 30-31. Nonetheless, we determined the challenged ordinance was administrative because it only dealt with a portion of the overall policy question as to how to improve the town's water system to provide water to consumers. *Whitehall*, ¶¶ 32-33. *See also Vagneur v. City of Aspen*, 295 P.3d 493, ¶ 47 (Colo. 2013) ("executive acts typically are not based on broad policy grounds, but rather, on

25

individualized, case-specific considerations" (quotation omitted)).  Likewise, here, the few 2010 amendments dealt with only a portion of the 2005 IA, and with a portion of the overall question of zoning in the donut, an issue with many other complexities.

¶45     The third guideline considers specialized knowledge necessary for the municipal action.  "[L]ocal enactments have been held nonreferable where they involve questions upon which the governing body of the local government has far better background, information, and access to the facts than the general electorate."  Sandra M. Stevenson, *Antieau on Local Government Law* vol. 6, § 89.06, at 89-18 (2d ed., Matthew Bender & Co. 2009).  Other jurisdictions have recognized that the decision to settle a lawsuit requires investigation and analysis, and appropriately lies within the discretion and business judgment of the local government.  *See Oakman*, 203 N.W. at 516; *Okerson v. Com. Council of City of Hot Springs*, 767 N.W.2d 531, 534-35 (S.D. 2009); *Vagneur*, ¶ 47 ("administrative decisions often concern matters involving specific data, facts and information necessary to arrive at a fair and accurate judgment upon the subject.  Thus, decisions that require careful study and specialized expertise, as well as discretionary judgment, generally are administrative in nature." (quotation omitted)).

¶46     The potential costs to the City of continuing the 2008 lawsuit, the assessment of the outcome of that litigation, including the potential that the County's primary statutory authority to zone in the donut would ultimately prevail, the cost/benefit analysis of seeking a cooperative relationship with the County, and the posture the City would maintain under the 2010 IA in order to pursue its future goals were factors that made the

decision to enter the agreement a technical one requiring intimate knowledge of the City's affairs, financing, and long-term goals. The decision required specialized knowledge in many areas and required the technical expertise and discretionary judgment of City officials and their advisors.

¶47     The last guideline primarily provides direction about how the guidelines should be weighed. "[C]ourts must determine when [a local government action's] administrative characteristics predominate enough to exclude it from the initiative and referendum process." *McAlister*, 212 P.3d at 194. While we carefully consider the legislative aspects of all local government decisions in a dispute such as this in order to preserve the maximum power of the people, *Whitehall*, ¶ 18, the power of referendum does not extend to all acts of local governments that bear legislative implications. As noted above, if the action of the local government is principally administrative, it will be considered administrative for this purpose, despite having legislative characteristics.

¶48     The Dissent would abandon application of the *Whitehall* factors as "vague, confusing, and awkward to apply," Dissent,¶ 52, thereby overruling our precedent and charting a new course—a proposition that none of the parties have advocated. As support for the theory that we no longer need to engage in troublesome balancing, the Dissent offers the characteristics of numerous enactments of the Legislature, Dissent, ¶¶ 53-44, but fails to recognize that *all* actions of a state legislature are inherently legislative by their very nature. Except for certain appropriation measures, all actions of the Legislature are subject to challenge by citizen initiative. Mont. Const. art. III, § 5(1)

27

("The people may approve or reject by referendum *any act* of the legislature except an appropriation of money." (emphasis added)). In contrast, local governing bodies act with multiple powers, not merely legislative, and the multi-faceted nature of their actions thus requires an analysis to determine if the purpose of a challenged action is fully or primarily legislative in nature. Otherwise—and this would inevitably be the net result of the Dissent's theory—without an analytical balancing, virtually all actions with policy implications would be subject to challenge. For example, in *Whitehall*, the ordinance requiring water meters, being inherently an act of legislation, albeit a small part of a larger issue, would necessarily be subject to challenge, and we therefore should have upheld the citizen's initiative there that sought to overturn the City's ordinance. However, we disagree that "[t]here can be no argument that adoption of an interlocal agreement is a legislative act," Dissent ¶ 59 (*see* § 7-11-104, MCA (authorizing interlocal agreements for "any administrative service, activity, or undertaking or to participate in the provision or maintenance of any public infrastructure facility, project, or service")), or that all "significant policy changes" are legislative actions subject to challenge by initiative, Dissent, ¶ 60.

¶49 Applying the *Whitehall* factors here, the 2010 IA was an amendment to the previous interlocal agreement between the City and the County. By its terms, it provided a limited duration.[4] The agreement was driven by a desire of neighboring and concurrent

---

[4] The 2005 IA did not contain a duration term, which was an issue in the 2008 litigation. While inclusion of a duration term represented a change from the 2005 IA, the ultimate legality of the 2005 IA was an unknown that was settled by adopting the new agreement.

local governments to settle contentious issues and pursue a course of cooperation. Fundamentally concerning the settlement of litigation, the decision to enter the 2010 IA and resolve the 2008 lawsuit, with limited assurances about the ultimate duration and outcome of the agreement, was a decision that required specialized knowledge and experience of the City's fiscal and other affairs. These factors weigh in favor of being considered an administrative action. We acknowledge that the 2010 IA and Resolution 10-46 also held legislative implications, including the addition of unspecified County oversight over the City's authority and the possibility that the City's authority, though contingent in nature, could be impacted in the future. However, no zoning was enacted or affected by the action, and the City's zoning authority was initially retained. Balanced together, we conclude that the City's action had significant administrative characteristics that made it principally administrative in nature, and that the legislative function did not predominate.

## CONCLUSION

¶50 We affirm the District Court's determination that Resolution 10-46 was not subject to the power of referendum. As we have determined that the Referendum did not validly rescind the City's authority to enter into the 2010 IA, we do not address whether the 2005 IA has been reinstated.


/S/ JIM RICE


29

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES A. HAYNES
District Court Judge
Sitting in for the Court

Chief Justice Mike McGrath dissenting.

¶51 While I concur with the majority's resolution as to Issue 1, I dissent as to the resolution of Issue 2. The Whitefish City Council's Resolution 10-46 was a legislative enactment and was thus subject to referendum by the voters.

¶52 The distinction between legislative and administrative acts is essentially whether the act creates new law (legislative) or executes an already existing law (administrative). *Whitehall v. Preece*, 1998 MT 53, ¶ 17, 288 Mont. 55, 956 P.2d 743. The majority's decision that Resolution 10-46 was an administrative measure derives from application of the four factors in the *Whitehall* case, which in turn were adopted from the Kansas decision in *Wichita v. Kan. Taxpayers Network*, 874 P.2d 667 (Kan. 1994). The problem with the four factors is that they are vague, confusing, and awkward to apply. Even the Kansas Supreme Court has since found that identifying the line between administrative and legislative actions is difficult. In a subsequent decision that Court decided that few actions are ever solely administrative or solely legislative; that the four factors set out in *Kansas Taxpayers* should be modified (by recognizing that the fourth factor is a statement of policy that is not helpful as a guideline for evaluating a specific set of facts);

30

and by adopting a new fourth factor involving delegated decision-making power. *McAlister v. City of Fairway*, 212 P.3d 184, 194-95 (Kan. 2009).

¶53 The four (or now three) *Kansas Taxpayer/Whitehall* factors are also confusing, and can unreasonably restrict the voters' right to participate in the referendum process. Factor 1 states, in part, that "permanency and generality are key features of a legislative ordinance." While that may be true, temporary measures may be wholly legislative as well. The Montana Legislature, for example, periodically enacts statutes that will expire on a certain date or will become effective only upon the happening of a certain event. *See e.g.* § 27-1-703, MCA, which is designated as "temporary" and the second § 27-1-703, MCA, set to become "effective on occurrence of contingency." When the people, through referendum, exercise the legislative power, that power should not be more limited than the power exercised by the Legislature. *See Carter v. Lehi City*, 269 P.3d 141, ¶ 31 (Utah 2012) ("The people's initiative power reaches to the full extent of the legislative power . . . .").

¶54 Factor 2 states that provisions "that deal with a small segment of an overall policy question generally are administrative." This does not even seem to be generally true, since statutes enacted by the Legislature frequently deal with small segments of larger groups or larger policy questions. *See e.g.* § 39-71-117(1)(d), MCA, which revised the Workers Compensation Act definitions of "employer" so as to bring within the umbrella of the Act "a religious corporation, religious organization, or religious trust receiving remuneration from nonmembers for agricultural production, manufacturing, or a

31

construction project conducted by its members on or off the property of the religious corporation, religious organization or religious trust." The representative who introduced this legislation, as well as other legislators, freely conceded that the amendment was directed specifically toward Hutterite religious colonies, and unquestionably and extremely small segment of state "employers." *(Mont. H. Comm. on Bus. & Labor, Hearing on H.B. 119*, 61st Legis., Reg. Sess. (Jan. 8, 2009); *Mont. Sen. Comm. on Bus., Labor, & Econ. Affairs, Hearing on H. Bill 119*, 61st Legis., Reg. Sess. (Mar. 5, 2009); *Big Sky Colony, Inc. v. Mont. Dep't of Labor & Indust.*, 2012 MT 320, ¶¶ 86-90, 368 Mont. 66, 291 P.3d 1231 (Rice, Nelson & Cotter, JJ., dissenting). *See also Carter*, ¶ 52 ("Legislation usually applies to more than a few people but there are circumstances where legislation may properly extend to only one or a few individuals. Such a law could still be 'legislative' where it (1) is based on general policy concerns rather than individual circumstances and (2) governs 'all future cases falling under its provisions' and not just specified individuals." (internal citations and quotations omitted)).

¶55   More importantly, however, Factor 2 does not allow for consideration of amendatory measures, such as Resolution 10-46. Looking again to the Montana Legislature, it routinely enacts statutes which are clearly legislative acts, but which are amended in future years in ways large or small. These amendatory actions are no less legislative than the ones that enacted the original entire statute. *See e.g. Margolis v. District Court*, 638 P.2d 297 (Colo. 1981) (where an original act is legislative, there is a presumption that an amendment to that act is likewise legislative); *State ex rel. Zonders v.*

32

*Delaware County Bd. of Elections*, 630 N.E.2d 313, 317 (Ohio 1994) ("Generally, the adoption of a zoning amendment, like the enactment of the original zoning ordinance, is a legislative act which is subject to referendum."). Factor 2 is therefore misleading and incorrect. An action that amends a prior legislative action will almost always also be a legislative action. These same considerations and criticisms apply to the first sentence of Factor 1 as well, wherein it states that an action which "makes new law is legislative." While generally true, that statement overlooks amendatory measures and confuses the situation when amendatory measures are being considered.

¶56    Factor 3 seems to be describing a situation in which governmental officials are called upon to apply training, experience and specialized knowledge to make decisions in specific situations as between several alternatives. This could describe discretionary decisions such as settlement of a lawsuit.

¶57    However, the fact that Resolution 10-46 was adopted as part of the settlement of a lawsuit with the County has little or nothing to do with whether the resolution itself is administrative or legislative. While the decision to settle the lawsuit per se may be administrative, it was undertaken in the separate Resolution 10-47. There is no reason why the City could not agree, as it did, to undertake a legislative act as part of the consideration for the settlement.[1] That is exactly what it did here. The City, as part of

---

[1] It is not unusual for the Montana Legislature to enact legislation as part of the settlement of a lawsuit. For example, that occurred when the Legislature enacted a statewide system for defense of indigent defendants charged with crimes. *See* § 47-1-101 et seq., MCA; and James Park Taylor, *Bespeaking Justice:  A History of Indigent Defense in Montana*, 68 Mont. L. Rev. 363, 381-84 (2007).

the settlement, agreed to approve and adopt the Restatement of Cooperative Interlocal Agreement with the County, making two important changes as to the term of the agreement and withdrawal from the agreement. Whether the Resolution is viewed as an action re-adopting the Interlocal Agreement or as an action amending the Interlocal Agreement, it is still a legislative measure.

¶58 The courts that have considered this administrative act/legislative act divide agree, as does the majority in this case, that the determination is ultimately "fact driven." Opinion, ¶ 33. Because of the fact driven nature of such determinations, some courts have simply adopted a case-by-case approach, guided by underlying principles of separation of powers and historical examples of recognized legislative power, when considering the legislative/administrative question. *See Vagneur v. City of Aspen*, 295 P.3d 493, ¶ 48 (Colo. 2013) ("Whether a proposed initiative is legislative or administrative remains a case-by-case inquiry. Although we give consideration to each of the tests we have described, no single test is necessarily controlling; rather, the principles underlying those tests must guide the overall determination of whether a proposed initiative is legislative or administrative."); *Carter*, ¶ 75 (recognizing that "[i]t will not always be easy to classify [for instance] a site-specific zoning amendment as falling clearly on the legislative or executive side of the line between the two.").

¶59 The facts of this case show the unmistakable legislative nature of the act at issue. The City Council of Whitefish adopted Resolution 10-46, which by its title, approved the "restatement" of the City-County Interlocal Agreement concerning zoning. There can be

34

no argument that adoption of an interlocal agreement is a legislative act, because the agreement gave the City authority to zone in the donut, or, phrased alternatively, created new law. Since adoption of a zoning ordinance would be a legislative act, it follows that an act granting such authority must also be a legislative act. Further, even if Resolution 10-46 simply adopted the agreement again, it would not lose its legislative nature.

¶60 Resolution 10-46 adopted two significant policy changes in the agreement, to provide for a five-year term and to allow withdrawal of a party. As noted above, amendment of a prior legislative enactment is itself a legislative act.

¶61 The facts here admit to but one conclusion, that Resolution 10-46 was a legislative measure. I dissent.

/S/ MIKE McGRATH

Justices Patricia Cotter and Michael E Wheat join the Dissent of Chief Justice Mike McGrath.

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT