FILED

06/09/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0602

DA 16-0602

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 139N

BRIAN MOONEY,

　　　　Plaintiff and Appellee,

　　v.

SUSAN ASHCRAFT,

　　　　Defendant and Appellant.

APPEAL FROM:　　District Court of the Tenth Judicial District,
　　　　　　　　　In and For the County of Judith Basin, Cause No. DV-2015-9
　　　　　　　　　Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellant:

　　　　　　Jack R. Stone, Attorney at Law, Lewistown, Montana

　　　　For Appellee:

　　　　　　Craig R. Buehler, Attorney at Law, Lewistown, Montana

　　　　　　　　　　　　Submitted on Briefs:　April 26, 2017

　　　　　　　　　　　　　　　　Decided:　June 9, 2017

Filed:

_____
　　　　　　　　Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2    Appellant Susan Ashcraft (Ashcraft) appeals the judgment of the Tenth Judicial District Court, Judith Basin County, granting a right to use the well located on her property to Appellee Brian Mooney (Mooney). We reverse.

¶3    Ashcraft owns Lots 4-6 and 11-13, Block 4, of the Original Townsite of Moccasin, Montana. Mooney owns Lots 7-10 and 14-18 of Block 4, which lie on either side of Ashcraft's property. Lot 11, one of Ashcraft's lots, contains a well that has served multiple properties in Moccasin over time, including the Moccasin School, which is now closed, and Mooney's property.

¶4    Ashcraft's predecessors-in-interest include Emma Todd (Todd) and Phillip J. Mills (Mills), who held the property as tenants-in-common. In 1997, Todd and Mooney's father, E. L. "Eddie" Mooney, signed a document entitled "Request for Water Usage," which stated in full:

> I, Emma Todd, do hereby grant E. L. Eddie Mooney the right and privilege to drawing water from my well located in Moccasin, MT. This privilege shall be for personal use only and shall endure as long as E.L. Mooney lives on and owns the property described as Lots 7, 8, 9[,] and 10[,] in Block 4 of the original townsite of Moccasin, Judith Basin County, Montana.

2

¶5 This document was not signed by Todd's co-tenant, Mills, and, further, the record indicates Mills was not advised of and did not know about Todd's action. On August 9, 2002, Todd executed a Power of Attorney appointing her niece, Mona Harrell (Harrell), as her attorney-in-fact. Harrell was authorized to make decisions concerning Todd's real estate interests. At some point, Todd hesitantly told Harrell that she had given permission to Eddie Mooney to use the well occasionally for purposes of building a garage. In 2002-2003, Mooney dug a trench for a water line from the well to his father's property based upon the verbal permission of Todd. During this time Ashcraft approached Mooney and told him he had no right to construct the ditch, but took no further action with regard to the ditch.

¶6 In March of 2003, Ashcraft purchased Mills' half-interest in the property, becoming a co-tenant with Todd. In May 2003, she sent Mooney a letter informing him that Harrell was Todd's attorney-in-fact and inquiries involving Todd's half-interest in the property should be directed to Harrell. The record indicates Ashcraft, like Mills, was not advised and did not know about the "Request for Water Usage" document, which had been signed by Todd and Eddie Mooney. In June of 2003, Mooney purchased Lots 7-10 and 14-18 from his father, which terminated the right to use the well granted under the 1997 "Request for Water Usage," according to its terms.

¶7 In November of 2003, despite Harrell's appointment as Todd's attorney-in-fact, and Ashcraft's letter advising Mooney to deal with Harrell, Todd and Mooney signed another "Request for Water Usage" that was similar to the first one, and which provided, in full:

3

> I, Emma Todd, do hereby grant Brian K. Mooney the right and privilege to drawing water from my well located in Moccasin, Montana. This privilege shall be for personal use only and shall endure as long as Brian K. Mooney lives on and owns the property described as Lots 7, 8, 9, 10, 14, 15, 16, 17[,] and 18[,] in Block 4 of the original townsite of Moccasin, Judith Basin County, Montana.

This document is referred to herein as the "Agreement." The record indicates that Harrell and Ashcraft were not advised and did not initially know about the existence of the 2003 Agreement.

¶8 Mooney testified that during the time period of "2003, '04, right in there, 2002 to 2004 let's say," a lock was placed on the pump house door, and Mooney cut it off. Yet, also in 2004, Mooney submitted a "Notice of Water Right" with the Department of Natural Resources and Conservation (DNRC) regarding the well. The notice, signed only by Mooney, listed Mooney and Harva Ashcraft, Ashcraft's sister, as the owners of the well, but added language in the "Remarks" section as follows: "*permission granted* by well owner Emma Todd." (Emphasis added.) There is no indication that either Todd or Ashcraft played any role in submitting the notice. However, testimony was given that Todd believed she was in control of the well and had granted Mooney permission to use the well because "she said she felt sorry for him because he'd been to prison." The DNRC issued an "Acknowledgement of Exempt Water Right" in the well, based on the notice submitted by Mooney.

¶9 Todd and Ashcraft were tenants-in-common and owned the property from 2003 until Todd's death in 2005. Harrell inherited Todd's interest in the property. In November 2006, an attorney for Harrell and Ashcraft, newly co-tenants, wrote to Mooney and asked

4

for clarification about the well usage.  In March 2007, then unaware of the Agreement, Harrell and Ashcraft sent a letter to Mooney's attorney, stating their belief that it was "not legal for a person go to on another person's land and hook up to their water without permission."  In August of 2007, Ashcraft purchased Harrell's interest in the property, becoming the sole owner.  Mooney used the well and performed maintenance on the pump continuously through the subject period.  At times, each party put locks on the pump house.  On one occasion, Harrell and Ashcraft placed a lock on the pump house, and Mooney took it off, proceeding to put his own lock on the pump house.  The Sheriff's Office was called on several occasions, with Harrell calling for assistance in dealing with Mooney's excessive yelling and profanity.  On one occasion, Ashcraft placed a lock on the pump house but gave a key to Mooney to access the pump house.  In July 2013, Ashcraft wrote to Mooney, stating,

> [u]nless there is an emergency situation, such as the power to the pump needing to be cut, fire, etc., I respectfully ask to be notified in advance of your intention to access the well through my property and I ask to be consulted in advance of any work done or changes made to the well or pump.

In December 2014, Mooney wrote to Ashcraft, returning two checks, which Ashcraft had previously given to Mooney for reimbursement of the costs of a new pump and other equipment for the well.  Mooney's letter stated:

> The well is a privelage [sic] to me & I thank you, so much.  To help you Physically [sic] & financially with this privelage [sic] is all I can do to show my appreciation.  P.S.  I will send check soon for the electricity bill for pump & water usage, again Thank you Very Much [sic].

5

¶10    In June of 2015, Ashcraft sent a letter to Mooney informing him that his access to the well would be terminated on July 10, 2015. Mooney initiated this litigation to prevent Ashcraft from shutting off the water. Additional facts will be discussed herein.

¶11    After a bench trial on September 7, 2016, the District Court concluded that: (1) the Agreement was a valid contract between Todd and Mooney, which granted Mooney a right to use the well and bound Ashcraft; (2) alternatively, Mooney had acquired a right to use the well through adverse possession; and (3) alternatively, laches barred Ashcraft from protesting Mooney's right to use the well.

¶12    "We review for clear error a district court's findings of fact." *Roland v. Davis*, 2013 MT 148, ¶ 21, 370 Mont. 327, 302 P.3d 91. "Clear error exists if substantial, credible evidence fails to support the findings of fact, if the district court misapprehended the evidence's effect, or if we have a definite and firm conviction that the district court made a mistake." *Roland*, ¶ 21. "We review de novo a district court's conclusions of law" to determine if the district court's conclusion is correct. *State v. Steigelman*, 2013 MT 153, ¶ 10, 370 Mont. 352, 302 P.3d 396; *Stanley v. Lemire*, 2006 MT 304, ¶ 52, 334 Mont. 489, 148 P.3d 643.

**Water Use Agreement**

¶13    The District Court determined that the four required elements of a contract were established, including consent, and the Agreement between Todd and Mooney was binding on Todd's co-tenant, then Ashcraft, even though Ashcraft did not sign the Agreement and was initially unaware of its existence. The general principle of law is that there is no agency

6

relationship between co-tenants and, therefore, one co-tenant cannot bind another co-tenant in a contract:

> Since there is, merely by reason of the existence of a cotenancy, no agency relationship between the cotenants, one cotenant cannot ordinarily bind cotenants by contracts with third persons or transfer or dispose of the interest of another cotenant in such a manner as to be binding, unless duly authorized to do so, unless his or her act is thereafter ratified by the other cotenants.
>
> .  .  .
>
> In the absence of authorization or ratification on the part of the cotenants, any dealing on the part of one cotenant in relation to the common property is a nullity insofar as their interests are concerned.

20 Am. Jur. 2d *Cotenancy and Joint Ownership* § 93 (2015) (citations omitted; annotations omitted). Our case law supports this general position. In *Dew v. Dower*, 258 Mont. 114, 128, 852 P.2d 549, 557 (1993), we stated "co-tenants are not generally agents of each other." As such, Todd was not an agent of Ashcraft and Todd's Agreement with Mooney was not binding upon her, unless she ratified the Agreement. Ratification requires: (1) "acceptance by the principal of the benefits of the agent's act"; (2) "with full knowledge of the facts"; and (3) "circumstances or an affirmation election indicating an intention to adopt the unauthorized arrangement." *Safeco Ins. Co. v. Lovely Agency*, 200 Mont. 447, 453, 652 P.2d 1160, 1163 (1982); *Erler v. Creative Fin. & Invs.*, 2009 MT 36, ¶ 27, 349 Mont. 207, 203 P.3d 744. The record here indicates that Todd did not inform either Harrell, her attorney-in-fact, or Ashcraft of the Agreement. And, according to the testimony, neither did Mooney. In fact, Harrell testified that Mooney told her he "had a paper" giving him a right to use the well, but refused to show it to her. She stated as follows:

7

[Brian Mooney said], I have the paper. And I said Brian I've asked you and asked you for a copy and I've asked you very nicely to see that. And he refused to show that to me [sic].

Given Todd's initial failure to provide notice of the Agreement to either Harrell or Ashcraft, and Mooney's actions to prevent them from seeing the Agreement, we cannot conclude that either Harrell or Ashcraft "accepted the full benefits" of the Agreement, with "full knowledge," and made "an affirmative election" of the Agreement. *Safeco Ins. Co.*, 200 Mont. at 453, 652 P.2d at 1163. The Agreement was therefore not ratified and is not binding on Ashcraft.

**Adverse Possession**

¶14 "A prescriptive easement arises by operation of law when a claimant proves that his or her use of another's property was open, notorious, exclusive, adverse, continuous, and uninterrupted for the statutory period." *Pedersen v. Ziehl*, 2013 MT 306, ¶ 13, 372 Mont. 223, 311 P.3d 765 (citation omitted; original emphasis removed); s*ee Havre Irrigation Co. v. Majerus*, 132 Mont., 410, 415, 318 P.2d 1076, 1078-79 (1957). Montana's prescriptive period is five years. Section 70-19-404, MCA. The District Court concluded that Mooney established his right to use the well through adverse possession because "[h]is use of the well [was] both hostile and adverse."

¶15 Importantly, "[i]f a use begins as a permissive use it is presumed to continue as such." *Pedersen*, ¶ 15 (internal quotation removed; citation omitted). "In fact, if the use begins as a permissive use, it cannot ripen into a prescriptive right, no matter how long it may continue, unless there is a distinct and positive assertion of a right hostile to the

8

owner." *Pedersen*, ¶ 15 (internal quotation removed; citation omitted). We have explained:

> [t]he law is very rigid with respect to the fact that a permissive use in the beginning can be changed into one which is hostile and adverse *only by the most unequivocal conduct on the part of the user*. The rule is that the evidence of adverse possession must be positive, *must be strictly construed against the person claiming a prescriptive right, and that every reasonable intendment should be made in favor of the true owner*.

*Martin v. Randono*, 175 Mont. 321, 327, 573 P.2d 1156, 1160 (1978) (emphasis added; internal quotation omitted; citations omitted).

¶16 There is ample evidence that Mooney's use of the well was long occasioned by a grant of permission. To begin, both the 1997 and 2003 agreements consisted of Todd's granting permission to use the well, which Mooney acknowledges as permissive. The 2003 Agreement stated "[t]his privilege shall be for personal use only and *shall endure as long as Brian K. Mooney lives on and owns the property . . . .*" (Emphasis added.) Although we held, above, that the Agreement was not binding upon Ashcraft, it nonetheless demonstrates Todd's act of extending permission to Mooney to use the well as long as he owned the neighboring property. Throughout the years, Mooney repeatedly claimed a right to use the well based upon this Agreement, and he never disavowed that written permission. While Mooney can point to various acts of aggression during the period, he does not demonstrate this was hostility supporting a claim of right rather than hostility expressed in the preservation of his permitted use. In fact, when the Sheriff was called to intervene, Mooney asserted that his right to use the well arose from "the paper," which he showed to the officer. Mooney points to Ashcraft's trial testimony and letters, which indicate that

9

Mooney did not have any right to use the well, as evidence of hostility. However, the letters also recognize that Mooney may have a permissive right to use the well that should be continued. In her 2007 letter to Mooney's attorney, Ashcraft indicates that if Todd had given Mooney permission to use the well, "then we can sit down and talk about the circumstances under which [Harrell] and I would be willing to sign a similar agreement with him. It is my belief that it would benefit all of us if this issue were clarified on paper." This evidence, and the record as a whole, presents equivocal intentions concerning whether the situation had become hostile or the parties were continuing to work from the 2003 grant of permission. In 2013, Ashcraft placed parameters on Mooney's access to the well in a letter. In 2014, Mooney wrote to Ashcraft that "[t]he well is a privelage [sic] to me"—the same language employed in the Agreement granting permission. As the District Court found, it was not until June 2015 that Ashcraft provided a "formal objection" to Mooney's use of the well. Critical here are the governing principles that use which begins as permissive is "presumed to continue as such" and can be changed into a hostile and adverse claim "only by the most unequivocal conduct on the part of the user." *Martin*, 175 Mont. at 327, 573 P.2d at 1160. As detailed above, Mooney's actions did not constitute "the most unequivocal conduct." Instead, his actions demonstrated vacillating intentions about the nature of his right to use the well, often expressing that his right to use the well arose from the permissive terms of the Agreement.

¶17 When we consider the record as a whole we are convinced the District Court misapprehended the effect of the evidence, and entered conclusions of law that were

10

incorrect. We conclude the District Court's legal conclusion that Mooney's use of the well "[was] both hostile and adverse" failed to apply the governing principle. Use that begins as permissive is presumed to remain permissive, unless countered by "the most unequivocal conduct," particularly where, as the record indicates here, Mooney repeatedly acknowledged that his right to use the well arose from that initial grant of permission. Mooney did not obtain a right to use the well through adverse possession.

**Laches**

¶18 Laches applies when one party has been negligent in asserting its rights and the other party had been prejudiced by the delay.

> Laches is an equitable doctrine by which a court may deny relief to a party who has unreasonably delayed or been negligent in asserting the claim, when the delay or negligence has prejudiced the party against whom relief is sought. For laches to apply, there must be a showing that the passage of time has prejudiced the party asserting laches or has rendered the enforcement of a right inequitable.

*Phillips v. City of Whitefish*, 2014 MT 186, ¶ 22, 375 Mont. 456, 330 P.3d 442 (internal quotations omitted; internal citations omitted). The District Court determined Ashcraft sat on her rights in violation of the policy codified at § 1-3-218, MCA. The District Court found Ashcraft should have acted, at the latest, in 2007 when she became the sole interest holder in the property. The District Court based this conclusion on its determination that Ashcraft "never gave either implied or explicit permission to use the well." As we have stated above, Mooney's use of the well began as permissive and was presumed to remain permissive. Ashcraft expressed concerns in person and through counsel, and offered to continue that permissive use. When Ashcraft sent her June 2015 letter indicating that she

11

intended to shut off water to Mooney, the relationship became unequivocally hostile. This litigation then followed. We conclude that Ashcraft did not sit on her rights and Mooney did not obtain a right to use the well through the application of laches.

¶19 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶20 We reverse the judgment of the District Court and remand for entry of a judgment in favor of Ashcraft.

/S/ JIM RICE

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER

Chief Justice Mike McGrath, dissenting.

¶22 I dissent. As the District Court noted, Brian Mooney brought this action after he invested significant time and expense based on his continuing right to use the well. Susan Ashcraft sat on her right to bring a claim for years. The doctrine of laches should be applied to her claim. It is inequitable to allow Susan Ashcraft to enforce her legal rights at this point in time. *Phillips v. City of Whitefish*, 2014 MT 186, 375 Mont. 456, 330 P.3d 442.

¶23 I would affirm the District Court.

/S/ MIKE McGRATH